IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

    V.          :          CRIMINAL NO. 11-226-01-03

HARRY KATZIN          :
MICHAEL KATZIN          :
MARK KATZIN          :

GOVERNMENT'S OMNIBUS RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO SUPPRESS PHYSICAL EVIDENCE

       The United States of America, by and through United States Attorney Zane David Memeger, and its undersigned attorneys, respectfully requests that the Court deny the defendants' motions to suppress physical evidence for the reasons set forth below.

I.   INTRODUCTION

       The defendants in this case have each filed motions to suppress the evidence of a burglary obtained during a search of their van pursuant to a search warrant after it had been seized by the Pennsylvania State Police (PSP).  The defendants collectively rest their arguments on three grounds.  The defendants first argue for suppression of evidence on grounds that the evidence was obtained because the FBI applied a GPS tracking device on the defendants' vehicle without first

1

obtaining a search warrant, in violation of the defendants'
Fourth Amendment rights to be free from unreasonable searches and
seizures.  The defendants also argue that the evidence obtained
from a search of their van should be suppressed on grounds that
it was stopped without reasonable suspicion, and searched without
probable cause.[1]

---

[1]All three defendants join in each other's motions to the
Court.  However, in the government's view, only Harry Katzin has
standing to contest the application of the GPS device on the
Dodge Caravan and the subsequent search and seizure of the
Caravan, as the evidence shows that the vehicle was owned by and
registered to Harry Katzin.   An individual's ability to "claim
the protection of the Fourth Amendment depends ... upon whether
he has a legitimate expectation of privacy in the invaded place."
Rakas v. Illinois, 439 U.S. 128, 143 (1978). A court may not
exclude evidence under the Fourth Amendment unless it finds that
an unlawful search or seizure "invaded [the defendant's]
legitimate expectation of privacy rather than that of a third
party." United States v. Payner, 447 U.S. 727, 731 (1980); see
also Rawlings v. Kentucky, 448 U.S. 98, 105-06 (1979).  Michael
and Mark were mere passengers in Harry Katzin's van.  It is clear
that a passenger in a car that he neither owns nor leases
typically has no standing to challenge a search of the car. See
Rakas, 439 U. S. at 133-34... (holding that there is no
legitimacy to a defendant's expectations of privacy where the
area searched is in the control of a third party)."Fourth
Amendment rights are personal rights, which, like some other
constitutional rights, may not be vicariously asserted."... "[A]
person who is aggrieved by an illegal search and seizure only
through the introduction of damaging evidence secured by a search
of a third party's premises or property has not had any of his
Fourth Amendment rights infringed." United States v. Baker, 221
F.3d 438, 441-42 (3d Cir.2000). See also Government of Virgin
Islands v. Williams, 739 F.2d 936, 937-39 (3d Cir. 1984) (police
recovered a.38 caliber gun from inside the torn cushion of the
front passenger seat; Court held that, under Rakas, passenger
sitting in that seat had no standing to challenge the search and
seizure).

All of the defendants' arguments are groundless.  The
government did not need to obtain a search warrant to apply a GPS
tracking to the exterior of a vehicle parked on a public street,
as was the case here.   Further, when the Pennsylvania State
Police stopped the defendants' van, there was ample reasonable
suspicion to justify the stop.  Based on evidence obtained during
the car stop, combined with other information obtained
previously, the PSP search of the defendants' vehicle was
supported by abundant evidence to establish the probable cause
finding made by the local magistrate for the search warrant.  All
of defendants' motions are thus meritless for the reasons more
fully explained below.

II.   FACTUAL BACKGROUND

A. December 15 and 16, 2010

During the late evening hours of Wednesday, December
15, 2010, FBI Special Agent (SA) Stephen McQueen was conducting
surveillance on Harry Katzin's steel blue 2001 Dodge Caravan,
bearing PA tag number HRD2148 (hereinafter referred to as the
"Dodge Caravan") through the use of a "slap-on" GPS device.  This
surveillance was accomplished with a "slap-on" GPS device that
FBI personnel applied to the exterior of the Dodge Caravan when
it was parked on the street in the lower Kensington section of
Philadelphia, on or about December 13, 2010.  SA McQueen had made

the arrangements for the device to be installed at that time because he was investigating the Katzin brothers for multiple pharmacy burglaries in the Philadelphia area.[2]  Surveillance indicated that the Dodge Caravan left the Philadelphia area at approximately 10:45 pm from the Kensington section of Philadelphia.  The Dodge Caravan traveled north on Interstate 476 north of the Interstate 76 interchange, and continued to travel north on Interstate 476 to Interstate 78.  The Dodge Caravan turned onto westbound Interstate 78 at approximately 11:24 p.m. and continued west on Interstate 78 to the town of Hamburg, Pennsylvania in Berks County.  Upon reaching Hamburg, the Dodge Caravan traveled south on 4th Street to the area of Hawk Ridge Drive.  The Dodge Caravan then stopped in that area at approximately 11:49 pm.  A Rite Aid Pharmacy[3] is located at 807 South 4th Street in Hamburg, PA.  The Dodge Caravan became stationery at 11:49 pm in the immediate vicinity of the Rite Aid pharmacy.

During his monitoring of the Dodge Caravan, SA Steven McQueen alerted Pennsylvania State Police (PSP) at the Hamburg Barracks and advised them of the Dodge Caravan's whereabouts and

---

[2] On that evening, SA McQueen was aware that all three Katzin brothers had been arrested before and had criminal histories.

[3] At the time, SA McQueen had been investigating a rash of burglaries at Rite Aid pharmacies in the greater Philadelphia area, to include, New Jersey, Delaware and Southeastern Pennsylvania that had occurred throughout much of 2010.

that the registered owner of the Dodge Caravan, Harry Katzin.  SA
McQueen further related that Harry Katzin was a suspected burglar
in numerous pharmacy burglaries.  SA McQueen advised the PSP that
Harry Katzin and others may be committing a burglary at the Rite
Aid Pharmacy located at 807 South 4th Street in Hamburg.
Troopers maintained a presence in the vicinity of the Rite Aid,
but they avoided direct surveillance of the Dodge Caravan to
avoid detection by the vehicle's occupants.  Special Agent
McQueen maintained frequent telephone contact with the PSP while
he monitored the Dodge Caravan, which remained stationary by the
Rite for almost three hours.  When the Dodge Caravan left the
vicinity of the Rite Aid at approximately 2:40 a.m. on December
16, 2010, Special Agent McQueen alerted the PSP.

        Within moments, PSP troopers Miller and Schuetrumpf
observed the Dodge Caravan, traveling north on 4th Street in the
Hamburg Borough near the on-ramp to Interstate 78 Eastbound.  PSP
troopers followed the Dodge Caravan onto I-78 eastbound (towards
Philadelphia) while Hamburg Police Department officers went to
the Rite Aid at 807 South 4th Street, in Hamburg, and confirmed
that it had been burglarized by looking through the drive through
window of the store.  Hamburg police officer Mengel relayed this
information to the PSP, whose troopers who were following the

Dodge Caravan.[4]

PSP troopers Schuetrumpf and Miller then executed a
traffic stop of the Dodge Caravan on eastbound I-78 at milepost
46.7, Weisenberg Township, Lehigh County, Pennsylvania.  Upon
stopping the Dodge Caravan, Troopers identified its occupants as
defendants Harry Katzin, his twin brother, Michael Katzin, and
their older brother, Mark Lewis Katzin Jr.  All three males
advised the PSP that they resided at 1922 East Firth Street,
Philadelphia, Pennsylvania.

While outside of the van, a PSP trooper looked inside
the Dodge Caravan and observed in plain view items which appeared
to be from the Rite Aid that had just been confirmed by the
Hamburg Police Department as having been burglarized, including
boxes of "Fusion" razor blades, contraceptive aids, a Wii Sports
pack, computer thumb drives, pill bottles, and Rite Aid plastic
storage bins.  Also in plain view within the Caravan were tools,
a duffel bag, and a surveillance system recordable hard drive
unit which had its wires cut from the rear.  The Caravan was
seized as evidence pending a search and seizure warrant and the
three Katzin brothers were placed in custody and transported to

---

[4] When officers later entered the Rite Aid store, and
inspected the store's interior, the officers found that most of
the pharmacy's Schedule II drugs were stolen along with other
products including items such as Gillette "Fusion" razor blades,
ink cartridges, perfume, electronic items such as computer thumb
drives, and electric tooth brushes.

the PSP barracks for investigation.

Meanwhile, the PSP Forensic Unit responded to the Rite Aid to collect evidence and document the crime scene.  The Forensic unit confirmed that the items which could be seen in plain view in the Dodge Caravan, such as "Fusion" razor blades, contraceptive aids, Wii Sports pack, thumb drives, pill bottles, and the surveillance system recordable hard drive unit, were items missing from the Hamburg Rite Aid.

PSP investigators also discovered that the Hamburg Rite Aid had its exterior phone lines cut, thus disabling its alarm system.  Forced entry was made on the Rite Aid's rear door. Tools were used to forcibly enter other areas of the store. Tools were also used to cut open a store safe, an Pennsylvania instant lottery machine, and pry open the locked security gate separating the Pharmacy's drug area.  The burglars took numerous drugs from the pharmacy including two bins from an automated prescription machine cabinet.  Those two empty bins which were missing their cartridges are labeled B-08 and C-12. Troopers found those cartridges with those labels in the Katzins' vehicle.

After PSP released the crime scene at the Rite Aid, the Rite Aid's manager conducted an audit to document the store's losses.  The manager determined that the PA Instant Ticket Lottery machine was missing approximately $291 in U.S. Currency; the pharmacy was missing approximately $36,113.47 in controlled

substances, and approximately $3,721.89 in non-controlled substances.  Other items were stolen from the store's shelves including GPS units, Razor blades, Electronic Toothbrushes, ink cartridges, Scandisk USB Flash drives, and other items totaling $3,200.  The physical damage to the store totaled approximately $6,395.06.

PSP troopers then obtained a search warrant to search Harry Katzin's 2001 Dodge Caravan, bearing PA tag number HRD2148, and VIN: 1B4GP44341B201084.  Upon execution of the search and seizure warrant, PSP troopers recovered the following items from the Dodge Caravan:

· A blue shopping basket with the words "RITE AID" on its sides.

· a black duffel bag containing numerous prescription pill bottles to include the two  missing Automatic dispensing cartridges are labeled B-08 and C-12.

· A large amount of prescription drugs including Schedule I, II, III, IV & V controlled substances, including but not limited to amphetamine salts, fentanyl, hydromorphone, methylphenidate, morphine sulfate, oxycodone, and hydrocodone APAP.

· Various tools, both hand and power including large and small pry bars, a Dewalt Brand grinder, wire cutters, bolt cutters, cordless drill, crow bar, screwdrivers, flashlight, and various other tools.

· Various electronic products still packaged including Curtis GPS units, electronic toothbrushes, digital picture frames, Wii Sport pack, calculators, portable DVD/CD players, Norelco Trimmer/Shaver, and other items.

· Video equipment including a CM2316, 16 camera color video multiplexer, Serial#060106038, with 13 coaxial cables cut or pulled out of the backside of the unit, and a GE Interlogix

video data recorder model VDR-)-CF, Serial# V301-CF-5N0211. These units were identified as the surveillance equipment removed from the Rite Aid during the night of December 15, 2010.

·    Various office type products still packaged including HP Ink printer cartridges, 1 Lexmark printer cartridge, USB extension cable, Scandisk USB Flash drives, SDHC and Mobile Micro Cards of various sizes.

·    Various Gillette brand razor cartridges and shaving systems all still in the manufacturers packaging.

·    Various "over the counter" medications such as Xantac, and Robitussin cough medicine. Shampoos, conditioners, perfume and cologne, and liquid Tide laundry detergent.

·    Numerous black face masks, latex and work gloves, and black baseball hats.

One of the pry bars that the PSP troopers found in the Caravan appeared to have a broken tip.  The troopers located a piece of metal lying in front of the Rite Aid's safe was consistent with the piece suspected to be missing from the end of the pry bar found in the Dodge Caravan.  The piece found at the crime scene in the Rite Aid fit into the broken section of the pry bar, and was aligned with it.

When the three Katzin brothers were arrested, Mark Katzin was wearing a pair of black Nike sneakers, a black hooded shirt, black Champ pants, and had $390.61 in his pockets. Michael Katzin was wearing a black Under Armour hoodie, Blue Dickie workpants, Gray Nike sneakers, and had $59.26 in his pockets.  Harry Katzin was wearing a Red Footlocker thermal shirt, Khaki Craftsman pants, Black Nike sneakers, and had $60.00 in his pockets.  Troopers seized the Katzins' clothes as

9

evidence, since two of the Katzins were covered in metal
shavings.  These metal shavings were similar to the metal
shavings found all over the floor at the site of the safe in the
Rite Aid store. (The metal safe's door had been sawed off from
its hinges with a power cutter.)

    B. <u>Earlier arrests and incidents</u>

        At the time the FBI placed a GPS device on Harry
Katzin's van on December 13, 2010, FBI SA Steven McQueen was
aware of the following incidents that had been documented by
local police in several townships during the year preceding the
Katzins's arrest on December 16, 2010.

        1) <u>Egg Harbor Twp. Rite Aid attempted burglary</u> - On
April 4, 2010, Egg Harbor City Police arrested Harry Katzin and
another male in an attempted pharmacy burglary in Egg Harbor
City, New Jersey.  The charges in this case were pending when PSP
Troopers arrested Katzin on December 16, 2010.

        2) <u>Feasterville Rite Aid Attempt</u> - On November 18,
2010, at approximately 1:44 a.m., a Lower Southampton Police
Department officer stopped defendant Harry Katzin for suspicious
activity.  Before the stop, a police observed a steel blue 2001
Dodge Caravan, bearing PA tag number HRD2148, parked behind the
shopping center located at the 1800 block of Brownsville Road,
Feasterville-Trevose, Pennsylvania.  The vehicle was registered
to Katzin at 1922 East Firth Street, in the Kensington section of

Philadelphia, Pennsylvania.  The Caravan was occupied by three males.  The police identified the three males as defendant Harry Katzin, his brother Michael Katzin, and another male.  A Rite Aid pharmacy was located in the corner of the shopping plaza.

Harry Katzin consented to the search of his vehicle. The police officer found numerous burglary tools, a miner's head lamp, several pairs of work gloves, and dark colored caps.  The officer released the three males without charging them.  Although the Rite Aid had not been burglarized that night, police learned later that day that the telephone lines in the rear of the Rite Aid had been cut.

3) Gibbstown New Jersey burglary - Over a week later, on November 26, 2010 at approximately 7:00 a.m., employees at a Rite Aid pharmacy located at 380 Harmony Road, Gibbstown, New Jersey, found that the store had been burglarized.  The electrical power lines to the shopping center had been cut, as were the phone lines for the Rite Aid pharmacy.  The actors entered the pharmacy through its rear door after prying it away from its threshold.  The pharmacy's Schedule II drugs were stolen, and the surveillance DVR machine had been removed from the manager's office.

Police responded to the scene and retrieved surveillance video from a nearby video surveillance camera located at an adjacent Shop Rite supermarket.  The videotape

showed a steel blue minivan pulling into the parking lot across the street from the Rite Aid.  This minivan appeared to be similar to Harry Katzin's 2001 Dodge Caravan in body shape and color.  The videotape showed two males sitting in the van for over an hour facing the direction of the Rite Aid.  The FBI believed that the males were waiting for any police response after cutting power to the stores alarm system.

III.   LEGAL ARGUMENT

    A.   The installation and monitoring of the GPS tracking device did not constitute a search and seizure.

       The defendants first argue that the evidence obtained from the search of their van should be suppressed as "fruit of the poisonous tree" because the discovery of the evidence was the result of FBI agents' placing a GPS tracking device on their vehicle without a search warrant and without their consent.  The defendants make their argument relying on a D.C. Circuit case, United States v. Maynard, 615 F.3d 544 (D.C. Cir. 2010), where the Court held that police violated the Fourth Amendment when they placed a GPS tracking device on a car's exterior for approximately 28 days without first obtaining a search warrant.

       In this case, the installation of the GPS device on defendants' vehicle was neither a search nor a seizure under New York v. Class, 475 U.S. 106, 114 (1986) and its progeny. Further, the subsequent monitoring of the GPS device on the

12

defendants' vehicle was not a search under <u>United States v. Knotts</u>, 460 U.S. 276 (1983) and <u>United States v. Karo</u>, 468 U.S. 705 (1984). Defendants rely on <u>Maynard</u> to suggest otherwise, 615 F.3d 544 (D.C. Cir. 2010), but the great weight of authority from other federal courts, including the Seventh, Eighth, and Ninth Circuits as well as numerous district courts – including two cases decided since <u>Maynard</u> – holds that the warrantless use of GPS tracking devices on vehicles in public places does not run afoul of the Fourth Amendment. Thus, for the reasons set forth below, the Court should deny defendants' motions to suppress on this ground.

> ### 1) Installation of the GPS did not constitute a search or a seizure.

It is well established that while the Fourth Amendment protects against certain governmental intrusions, it has never been held to provide a generalized right to privacy. <u>Katz v. United States</u>, 389 U.S. 347, 350 (1967). The modern test for analyzing whether a defendant had a legitimate expectation of privacy in the place searched was promulgated in Justice Harlan's concurring opinion in <u>Katz</u>: "first, whether the defendant has exhibited an actual, subjective, expectation of privacy; and second, whether such subjective expectation is one which society is willing to recognize as objectively reasonable." <u>United States v. Sparks</u>, 2010 WL 4595522 at * 3 (D. Mass. Nov. 10, 2010) (Young, J.) (citing *Katz*, 389 U.S. at 361) (Harlan, J.

concurring).

The Supreme Court has repeatedly held that motor vehicles are entitled to a significantly diminished expectation of privacy. *See, e.g.,* Cardwell v. Lewis, 417 U.S. 583, 590 (1974); New York  v. Class, 475 U.S. 106, 114 (1986) ("The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a search"). Accordingly, the minimal physical intrusion of affixing a GPS device to the exterior of a vehicle does not, standing alone, implicate the Fourth Amendment.  See Sparks*,* 2010 WL 4595522 at * 6 (citing cases).

Likewise, the Supreme Court has been clear that "a 'seizure' of property occurs when 'there is some meaningful interference with an individual's possessory interest in that property.'" United States v. Karo, 468 U.S. 705, 712 (1984) (quoting United States v. Jacobsen, 466 U.S. 109,113 (1984)). The Karo court made clear that the law of trespass "is only marginally relevant to the question of whether the Fourth Amendment has been violated, however, for an actual trespass is neither necessary nor sufficient to establish a constitutional violation." Id. at 712-13.

Nearly every case to have analyzed the installation of a GPS tracker to the exterior of a vehicle has found it not to constitute a search or a seizure. *See, e.g.*, United States v.

14

<u>Garcia</u>, 474 F.3d 994, 996 (7th Cir. 2007) ("device did not affect the car's driving qualities, did not draw power from the car's engine or battery, did not take up room that might otherwise have been occupied by passengers or packages, did not even alter the car's appearance, and in short did not 'seize' the car in any intelligible sense of the word"); <u>United States v. McIver</u>, 186 F.3d 1119, 1127 (9th Cir. 1999) (finding no "seizure" where slap-on devices did not "deprive [McIver] of dominion and control of his [vehicle], nor did [McIver] demonstrate that the presence of these objects caused any damage to the electronic components of the vehicle"); <u>United States v. Rascon-Ortiz</u>, 994 F.2d 749, 754 (10th Cir. 1993) ("[T]he undercarriage is part of the car's exterior, and as such, is not afforded a reasonable expectation of privacy."); <u>United States v. Walker</u>, Slip Op. at 15-17 (W.D. Mich Feb. 11, 2011) (Bell, J.) ("here, as in <u>Karo</u>, although the officers may have added to defendant's property an unknown and unwanted foreign object, it cannot be said that anyone's possessory interest was interfered with in a meaningful way") (attached here as Exhibit 1); <u>United States v. Sparks</u>, 2010 WL 4595522 *6 (D. Mass. Nov. 10, 2010) ("The minimal physical intrusion associated with affixing a GPS device will not, standing alone, create a Fourth Amendment violation."); <u>United States v. Burton</u>, 698 F. Supp. 2d 1303, 1308 (N.D. Fla. 2010) ("The device was not placed on the interior of the vehicle, and

required no dismantling, opening, or otherwise significant disturbance of the vehicle to attach or activate it."); <u>United States v. Coombs</u>, 2009 WL 3823730 (D. Ariz. Nov. 12, 2009); <u>United States v. Williams</u>, 650 F. Supp. 2d 633, 668 (W.D. Ky. 2009) ("given the extremely minimal intrusion of the officers who magnetically attached the tracking devices to the vehicle ... no search warrant or other court order was required"); <u>*United States v. Coulombe*</u>, 2007 WL 4192005 *4 (N.D.N.Y. Nov. 26, 2007); <u>United States v. Moran</u>, 349 F. Supp. 2d 425, 467 (N.D.N.Y. 2005).

The location of the Katzin vehicle at the time that the GPS was initially installed, does not change that analysis.[5]  The GPS was initially placed on the vehicle while it was parked on a public street.  An FBI special agent will testify that he observed FBI technical personnel applying the device to the exterior of the Katzin van on December 13, 2010, approximately three days before the defendants' arrest.

> 2) Monitoring of the GPS device did not constitute a search.

In <u>United States v. Knotts</u>, 460 U.S. 276 (1983), the Supreme Court, recognizing that a "search" within the meaning of the Fourth Amendment occurs only where a "legitimate expectation of privacy . . . has been invaded by government action,"

---

[5] The defendants have not addressed the question of whether there are any constitutional ramifications to the location of the vehicle.

determined that no search occurs when the police use an electronic beeper to track the movement of a vehicle on public roads. Knotts, 460 U.S. at 280, 281 (internal punctuation omitted).  In so doing, the Court recognized that a person "travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." Id. at 281.  The beeper essentially served as a substitute for visual surveillance, and "[n]othing in the Fourth Amendment prohibited the police from augmenting [their] sensory faculties . . . with such enhancement as science and technology afforded them in this case." Id. at 282.  In United States v. Karo, 468 U.S. 705 (1984), the Supreme Court reaffirmed that no search occurs when the police monitor a beeper device during periods when it is exposed to public view, such as on highways. Id. at 714-15.  Indeed, this result is virtually compelled by the Court's general statement in Katz v. United States, 389 U.S. 347, 351 (1967), that "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."

     Indeed, the great majority of federal courts to address this issue directly in the context of GPS technology have held that it is not a search for the police to monitor a GPS tracking device on the undercarriage of a car while the car is located in an area in which a defendant has no reasonable expectation of privacy.  See, e.g., United States v. Pineda-Moreno, 591 F.3d

17

1212 (9th Cir. 2010); <u>United States v. Garcia</u>, 474 F.3d 994 (7th Cir. 2007); <u>United States v. McIver</u>, 186 F.3d 1119, 1127 (9th Cir. 1999); <u>United States v. Walker</u>, Slip Op. at 15-17 (W.D. Mich Feb. 11, 2011); <u>United States v. Sparks</u>, 2010 WL 4595522 *6-10 (D. Mass. Nov. 10, 2010); <u>United States v. Jesus-Nunez</u>, 2010 WL 2991229 (M.D. Pa. July 27, 2010); <u>United States v. Burton</u>, 698 F. Supp. 2d 1303, 1305 (N.D. Fla. 2010); <u>United States v. Coombs</u>, 2009 WL 3823730 (D. Ariz. Nov. 12, 2009); <u>Morton v. Nassau Cty. Police Dept.</u>, 2007 WL 4264569 (E.D.N.Y. Nov. 27, 2007); <u>United States v. Coulombe</u>, 2007 WL 4192005 *4 (N.D.N.Y. Nov. 26, 2007); <u>United States v. Moran</u>, 349 F. Supp. 2d 425, 467 (N.D.N.Y. 2005); see also <u>United States v. Marquez</u>, 605 F.3d 604, 610 (8th Cir. 2010) (while reserving on the question of whether GPS monitoring constitutes a search, the court held that reasonable suspicion was sufficient (though not necessarily required) to support the installation and use of a GPS device on defendant's vehicle).

   All of these decisions have found that the rationale of <u>Knotts</u> controls. That is, there is no reasonable expectation of privacy in public travel. That law enforcement use technological devices to augment otherwise legitimate investigatory tactics, to wit visual surveillance, does not change the Fourth Amendment analysis. <u>Knotts</u>, 460 U.S. at 282. In <u>Garcia</u>, the Seventh Circuit concluded that "GPS tracking is on the same side of the divide with the surveillance cameras and the satellite imaging,

and if what they do is not searching in Fourth Amendment terms, neither is GPS tracking." <u>Garcia</u>, 474 F.3d at 997.

In this case, the GPS device monitored and recorded the movement of the vehicle over areas exposed to public view for approximately three days.  Whether it did so for one day or for 30 days, it was recording information that investigators could have observed by conducting physical surveillance over that period.  See <u>Smith v. Maryland</u>, 442 U.S. 735, 745 (1979) (the question is not what a person could do or likely do, but rather what he feasibly could do); <u>Sparks</u> at *9 ("[w]arrantless visual surveillance or 'tailing' of [defendant] ... would have revealed to the FBI all of the same details the GPS device provided, only at a much higher cost, and possibly at a higher risk to law enforcement officers.  Where the use of a tracking device serves only as a technological substitute for otherwise legal activity, it must remain constitutionally sound.").

The Supreme Court in *Knotts* rejected the notion that use of technology to track movements otherwise exposed to public view is constitutionally infirm:

> Insofar as respondent's complaint appears to be simply that scientific devices such as the beeper enabled the police to be more effective in detecting crime, it simply has no constitutional foundation.  We have never equated police efficiency with unconstitutionality, and we decline to do so now.

*Knotts,* 460 U.S. at 284.  And with specific reference to GPS

19

technology such as that employed here, the Seventh Circuit

stated, *inter alia:*

> If a listening device is attached to a
> person's phone, or to the phone line outside
> the premises on which the phone is located,
> and phone conversations are recorded, there
> is a search (and it is irrelevant that there
> is a trespass in the first case but not the
> second), and a warrant is required.  But if
> police follow a car around, or observe its
> route by means of cameras mounted on
> lampposts or of satellite imaging as in
> Google Earth, there is no search.  Well, but
> the tracking in this case *was* by satellite.
> Instead of transmitting images, the satellite
> transmitted geophysical coordinates.  The
> only difference is that in the imaging case
> nothing touches the vehicle, while in the
> case at hand the tracking device does.  But
> it is a distinction without any practical
> difference.
>
> There is a practical difference lurking here,
> however.  It is the difference between, on
> the one hand, police trying to follow a car
> in their own car, and, on the other hand,
> using cameras (whether mounted on lampposts
> or in satellites) or GPS devices.  In other
> words, it is the difference between the old
> technology -- the technology of the internal
> combustion engine -- and new technologies
> (cameras are not new, of course, but
> coordinating the images by thousands of such
> cameras is).  But GPS tracking is on the same
> side of the divide with the surveillance
> cameras and the satellite imaging, and if
> what they do is not searching in Fourth
> Amendment terms, neither is GPS tracking.

*Garcia,* 474 F.3d at 997 (Posner, J.).  The Seventh Circuit, in

other words, rejected the notion that the nature of GPS

technology transforms the obtaining of information exposed to

public view (the location of a vehicle on public roads) into a

search.

      3) The holding in Maynard does not apply to the facts here.

      The discussion above shows that Maynard was wrongly decided.  However, even under Maynard, the surveillance here was proper.  More recently, when addressing a set of facts similar to those before this Court here, the Seventh Circuit in United States v. Cuevas-Perez, 640 F.3d 272, 272 -276 (7th Cir. 2011) distinguished the Maynard decision in holding that it did not apply when the GPS unit was only attached to a vehicle for 60 hours, as opposed to 28 days, as was the case in Maynard.   In Cuevas-Perez, the defendant was a suspect in narcotics distribution when law enforcement applied a GPS device to the exterior of the defendant's vehicle.  Shortly after agents applied the device, the defendant embarked on a road trip during which time he traveled through five states before arriving in Illinois.  During the surveillance when the device's battery began to run low, other agents initiated human surveillance of the defendant, and ultimately stopped the defendant approximately 60 hours after the initial installation of the device.  After a drug dog alerted for the presence of narcotics, the defendant's vehicle was searched and agents found multiple kilograms of heroin embedded in it.  The defendant moved to suppress the evidence, arguing in reliance on Maynard that the evidence had been procured in violation of the Fourth Amendment, since it was

obtained as a result of law enforcement agents' application of a GPS tracking device without first obtaining a search warrant.

The Court in <u>Cuevas-Perez</u> upheld the use of the GPS device after considering <u>Maynard</u>.  After first summarizing the precedent that supported the use of GPS devices for law enforcement to surveil suspects without the need for probable cause or reasonable suspicion, the Court summarized the Maynard decision:

> An important apparently contrary precedent has been established in the D.C. Circuit. <u>United States v. Maynard</u>, 615 F.3d 544 (D.C.Cir.2010). In <u>Maynard</u>, the court considered the Fourth Amendment implications of the uninterrupted use of a GPS device for a period lasting 28 days. The court held that prolonged GPS surveillance could amount to a search, because it may reveal more than just the movements of a vehicle on public roads; that is, it may reveal something approaching the totality of a person's lifestyle, affairs and possible criminal activities during a long period. <u>Id</u>. at 558-63. The court stated in relevant part, "unlike one's movements during a single journey, the whole of one's movements over the course of a month is not actually exposed to the public because the likelihood anyone will observe all those movements is effectively nil." <u>Id</u>. at 558 (emphasis omitted).

640 F.3d at 274.

The Court in <u>Cuevas-Perez</u> went on to distinguish the facts before it from those in <u>Maynard</u>, in support of its ultimate holding that <u>Maynard</u> did not apply:

> The aspects of the search in Maynard that affected the court's decision are absent here. The 28-day surveillance in Maynard was much lengthier than the 60-hour surveillance in the case before us. Moreover, the Maynard court repeatedly distinguished the surveillance at issue there from surveillance during a

single journey. See <u>Maynard</u>, 615 F.3d at 558, 560, 562,
565. For instance, the court stated, "[s]urveillance
that reveals only what is already exposed to the
public—such as a person's movements during a single
journey—is not a search." Id. at 565 (citing <u>Knotts</u>,
460 U.S. at 285, 103 S.Ct. 1081). The case before us,
so far as the record reveals, involves such a
"single-trip" duration of surveillance. Unlike in
<u>Maynard</u>, the surveillance here was not lengthy and did
not expose, or risk exposing, the twists and turns of
Cuevas-Perez's life, including possible criminal
activities, for a long period.  As the <u>Maynard</u> court
noted, the chances that the whole of Cuevas-Perez's
movements for a month would actually be observed is
effectively nil—but that is not necessarily true of
movements for a much shorter period.

<u>Cuevas-Perez</u>, 640 F.3d at 274-75.

        The facts before this Court here are far more in
alignment with those in <u>Cuevas-Perez</u>, where the warrantless
application of a GPS device on a motor vehicle on a public street
for only three days was upheld, as opposed to the facts in
<u>Maynard</u>, where the GPS device had already been on a motor vehicle
for approximately 28 days, before the evidence at issue was
seized.  Here, the FBI had applied the GPS device on December 13,
2010, only two days before SA McQueen commenced the surveillance
of Harry Katzin's van in the late evening hours of December 15,
2010.  Thus, the circumstances that were of particular concern to
the <u>Maynard</u> Court are absent here.[6]  The defendants' argument
that the GPS evidence is inadmissible because the government did

---

        [6] In advancing this point, the government is not abandoning
its position that the <u>Maynard</u> case was wrongly decided, is not
controlling, and cannot be reconciled with Supreme Court
precedent.

not obtain a search warrant before applying the device on the
defendant's car is thus meritless.

      B.    <u>There was ample reasonable suspicion to justify a car
stop of the Dodge Caravan.</u>

      Defendants also argue for suppression of the evidence
seized from the van that they were occupying on December 16, 2010
on grounds that the PSP violated the defendants' Fourth Amendment
rights by executing a stop of his vehicle without reasonable
suspicion or probable cause.  For the reasons given above, these
arguments are without merit because there was no search and
seizure here and therefore no requirement to show probable cause
or reasonable suspicion.

      Assuming that reasonable suspicion is required, the
officers had ample evidence and facts at their disposal to
warrant an investigatory stop on reasonable suspicion grounds.
Under <u>Terry v. Ohio</u>, 392 U.S. 1, 21 (1968), an officer may,
consistent with the Fourth Amendment, conduct a brief
investigatory stop of a person when the officer has a reasonable,
articulable suspicion that criminal activity is afoot. See also
<u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000).  Reasonable
suspicion is "a less demanding standard than probable cause and
requires a showing considerably less than preponderance of the
evidence." <u>Id</u>. Elaborating on this point, the Supreme Court has
said, "[r]easonable suspicion is a less demanding standard than
probable cause not only in the sense that reasonable suspicion

24

can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." Alabama v. White, 496 U.S. 325, 330 (1990).

"Reasonable suspicion" is based upon that whole picture the detaining officers must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity" based upon the totality of the circumstances.  United States v. Nelson, 284 F.3d 472, 478 (3d Cir. 2002), quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981). In formulating reasonable suspicion, the officers' "experience and specialized training may allow them to make inferences and deductions from information that 'might well elude an untrained person."' United States v. Arvizu, 534 U.S. 266, 273 (2002).

In this case, the circumstances established that the officers had reasonable suspicion to believe that the occupants of the van were engaged in criminal activity, that is the recent burglary of the Rite Aid pharmacy in Hamburg, Pennsylvania, and they were thus entitled to conduct an investigatory Terry stop on this basis.  This reasonable suspicion was formed by the collective knowledge of the investigative team that evening that included law enforcement members of the FBI, the PSP, and the Hamburg Police.

The reasonable suspicion here was formed by a totality of the facts and circumstances known by investigators at the time of the search.  Because of Special Agent McQueen's monitoring of the GPS device on the Katzin van, law enforcement knew that Harry Katzin's van left inner-city Philadelphia on an exceptionally cold December night at approximately 10:50 p.m. heading toward the Northwestern suburbs.[7]  The van continued to drive straight out of the Philadelphia area.  SA McQueen was already aware at that time that Harry Katzin, in whose name the van was registered, had been previously arrested for pharmacy burglary in April 2010, and had been previously stopped in the parking lot outside a Rite Aid pharmacy by Lower Southampton Police in the early morning hours of November 18, 2010, and found with burglary tools.

SA McQueen was also aware that Rite Aid pharmacies had been getting burglarized with a great degree of frequency in 2010, and was investigating these burglaries in coordination with local law enforcement.  He therefore possessed a mapping information showing all of the geographic locations of Rite Aid Pharmacies in the greater Philadelphia area.  At approximately 11:49 p.m., the Katzin van became stationary in the parking lot near the Rite Aid Pharmacy on 4th Street in Hamburg,

---

[7] According to weather data for December 16, 2010, the low temperature was 18 degrees in Hamburg, Pennsylvania on that date.

26

Pennsylvania, according to GPS data SA McQueen's government laptop.  SA McQueen reported to the PSP that the Katzin brothers were suspected burglars and were stopped outside a Rite Aid in Hamburg.  PSP troopers went to the area, but remained sufficiently distant from the Dodge Caravan to avoid detection.  The van remained stationary near the Hamburg Rite Aid until 2:40 a.m., on December 16, 2010, when the van began to move away from the Rite Aid and proceed down 4th Street towards the I-78 on-ramp.  SA McQueen continued to inform the PSP about the Katzins' movements, and when the Katzin van began to proceed eastbound on I-78 towards Philadelphia, PSP troopers were openly following the Katzin van from behind.

PSP troopers were also communicating with local Hamburg Police.  Hamburg Police Officer Mengel proceeded to the Rite Aid shortly after the departure of the Katzin van.  Officer Mengel peer into the pharmacy's drive through window and saw obvious indications that the store had just been burglarized.  Officer Mengel then reported this information to the PSP troopers, who promptly pulled over the Katzin van, on the basis that there was reasonable suspicion that the van's occupants were engaged in criminal activity.

In their motions, the defendants attempt to parse the information known to the two officers involved in the car stop and arrest in an effort to attack the government's basis for

r]easonable suspicion.  The defendants argue that the only reason the two troopers stopped the Dodge Caravan was because they were told that Rite Aid in Hamburg borough had been burglarized.  The defendants maintain that the troopers who stopped the van had no information that the defendants had been near the Rite Aid, or had done anything criminal in nature, and that therefore the two individual troopers' stop of the Dodge Caravan was not based on a reasonable articulable suspicion of criminal activity.

        This effort is unavailing, as the Third Circuit has embraced the collective knowledge doctrine, under which information known to one member of an investigative team is imputed to all of the others.  The "collective knowledge doctrine" is applicable here and further demonstrates that the stop was lawful.  Under this doctrine, in determining if a <u>Terry</u> stop is supported by reasonable suspicion, the collective knowledge of other officers involved in the criminal investigation is imputed to the officer who makes the stop.  See <u>United States v. Whitfield</u>, 634 F.3d 741, 745-46 (3d Cir. 2010) (3d Cir. Dec. 6, 2010) (holding that the collective knowledge doctrine applies to <u>Terry</u> seizures as well as in other Fourth Amendment contexts).  See also <u>United States v. Williams</u>, 429 F.3d 767, 771, 72 (8th Cir. 2005) (collective knowledge of the DEA team was sufficient to provide reasonable suspicion to stop defendant's car and such knowledge was imputed to the officer

when he received the radio request); United States v. Ramirez, 473 F.3d 1026, 1037 (9th Cir. 2007) (collective knowledge doctrine justified warrantless stop of automobile by police officer at request of investigating officer within same police department without any relay by investigating officer of factual basis for his determination to other officer that reasonable suspicion or probable cause existed); United States v. Rodriquez, 831 F.2d 162 (7th Cir. 1987) (endorsing application of collective knowledge doctrine where DEA agents had reasonable suspicion to stop the defendant's vehicle based on prior surveillance of narcotics activity, but requested local law enforcement to conduct a routine traffic stop for them; the trooper "was therefore merely acting as an 'extension' or agent of the DEA agent and she could act on the DEA agent's suspicions"). See also United States v. Burton, 288 F.3d 91, 100 (3d Cir. 2002) (affirming stop where DEA agents had probable cause to arrest Burton and asked police to stop him; arresting officer can instead rely on an instruction to arrest delivered by other officers possessing probable cause).

The collective knowledge of the federal agents and the PSP troopers was properly imputed to Troopers Schuetrumpf and Miller, and also created reasonable suspicion to conduct an investigatory stop. In sum, the car stop of the Katzin vehicle was lawful and not in violation of the Fourth Amendment.

C.   There was probable cause to search the Dodge Caravan.

Once the troopers made the vehicle stop, they continued to develop probable cause for the search of the vehicle. "[P]robable cause" is a "common sense, nontechnical conception[] that deal[s] with the factual and practical observations of everyday life on which reasonable and prudent men, not legal technicians, act." Ornelas v. United States, 517 U.S. 690, 695 (1996) (internal quotation marks omitted). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." Devenpeck v. Alford, 543 U.S. 146, 152 (2004). Shortly after the PSP troopers stopped the Katzin vehicle and ordered the brothers out of the van, they observed items in plain view inside the vehicle, that were obviously items culled from a drugstore, including plastic bins labeled with the Rite Aid store brand name. The discovery of these items in plain view after being informed that a burglary had just been committed at a nearby Rite Aid pharmacy at the time of the vehicle stop was sufficiently "articulable and particularized" to establish probable cause to search the Katzin vehicle.  United States v. Ramos, 443 F.3d 304, 308 (3d Cir. 2006); see United States v. Johns, 469 U.S. 478, 479-80 (1985) ("[a]fter the officers came closer and detected the distinct odor of marihuana, they had probable cause to believe that the vehicles contained contraband").

30

In this case, there was probable cause for the troopers
to search the vehicle at that time, given that they had received
confirmation that a Rite Aid store had just been burglarized, and
that the troopers first spotted the Katzin van on 4th Street at
the I-78 on-ramp in Hamburg, only minutes away from the Rite Aid
that had been burglarized.  Under the automobile exception to the
warrant requirement, law enforcement officers may search a
vehicle without a warrant as long as they have probable cause to
believe that it contains contraband. Maryland v. Dyson, 527 U.
S.465, 466 (1999); Chambers v. Maroney, 399 U. S.42, 52 (1970);
Carroll v. United States, 267 U. S.132, 153-56 (1925); United
States v. Burton, 288 F.3d 91 (3d Cir.2001). If there is probable
cause to search a lawfully seized vehicle, that probable cause
"justifies the search of every part of the vehicle and its
contents that may conceal the object of the search." United
States v. Ross, 456 U. S.798, 825 (1982); accord United States v.
Salmon, 944 F.2d 1106, 1123 (3d Cir. 1991).  Despite the fact
that probable cause existed for the troopers to search the Katzin
vehicle upon observing the Rite Aid store items in plain view
inside the Katzin van under a totality of the circumstances, the
troopers did not search the vehicle at that time, and instead
impounded it for the purpose of obtaining a search warrant, which
PSP trooper Matthew Brady did obtain later that day from a local
magistrate.

31

A search conducted pursuant to a search warrant should be upheld if the judicial officer who issued the warrant had a "substantial basis" for concluding that probable cause existed for the search. Illinois v. Gates, 462 U.S. 213, 238-39 (1983). This Court's review of an initial probable cause determination is deferential and limited to ensuring that the magistrate had a substantial basis for concluding that probable cause existed. United States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993).  In evaluating a search warrant, the Court should "uphold the warrant as long as there is substantial basis for a fair probability that evidence will be found." Id.  A reviewing court is not to make its own probable cause assessment, but "determine only whether the affidavit provides a sufficient basis for the decision the [bail commissioner] actually made." United States v. Jones, 994 F.2d 1051, 1057 (3d Cir. 1993).  Probable cause exists when, after considering the totality of the circumstances, there is a "'fair probability that contraband or evidence of a crime will be found in a particular place."' United States v. Grubbs, 547 U.S. 90, 95 (2006), quoting Illinois v. Gates, 462 U.S. 213, 238 (1983). Whether probable cause exists is determined under the "totality of the circumstances." Gates, 462 U.S. at 238.  A probable cause finding does not require that it be "more likely than not" that evidence will be found in the place described. See Texas v. Brown, 460 U.S. 730, 742 (1983) (probable cause

"does not demand any showing that such a belief be correct or more likely true than false"); United States v. Cruz, 834 F.2d 47, 50 (2d Cir. 1987) (probable cause does not require proof "that it is more probable than not that a crime has been or is being committed").  Probable cause simply requires a "fair probability" that evidence will be found. Gates, 462 U.S. at 238; United States v. Shechter, 717 F.2d 864, 869 (3d Cir. 1983). Furthermore, "[t]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." Gates, 462 U.S. at 238.

Here the affidavit in support of the warrant contained abundant evidence to support the magistrate's probable cause finding that the defendants had committed the burglary at the Rite Aid Pharmacy in Hamburg.  The affidavit cites SA McQueen's surveillance of the Katzin van, and its location near a Rite Aid pharmacy at approximately 11:50 p.m.  Almost three hours later, the van leaves the area of the Rite Aid pharmacy and begins to travel back to Philadelphia.  Troopers spot the van on 4th Street within minutes of being notified of the van's departure from the Rite Aid, the same street where the Rite Aid was located, getting on the Interstate 78 eastbound on-ramp, the direction of Philadelphia.  Before stopping the van, troopers received confirmation from a local Hamburg police officer that the Rite Aid had been burglarized.  Upon stopping the van, the troopers

33

observed "in plain view tools, electronics, dufflebags, pharmacy goods and . . . surveillance systems with cut wires" in the Katzin vehicle.  The affidavit further contains confirming information from the pharmacy employees about the specific items taken and the damage done to the pharmacy property.

Accordingly, the magistrate was justified in finding that probable cause existed when, after considering the totality of the circumstances, there was a "'fair probability that contraband or evidence of a crime will be found in a particular place,"' Grubbs, 547 U.S. at 95, quoting Gates, 462 U.S. at 238, in this case, the Katzin van.  The defendants' arguments to the contrary are accordingly meritless.  The evidence obtained from the search of the Katzin vehicle should be admitted.

III.   <u>CONCLUSION</u>

      WHEREFORE, the defendants' motions to suppress physical evidence of the Rite Aid burglary recovered from the defendants' vehicle and persons, should be denied.


                    Respectfully submitted,

                    ZANE DAVID MEMEGER
                    United States Attorney

                    THOMAS PERRICONE
                    Assistant United States Attorney
                    Chief, Narcotics


                    *Thomas M. Zaleski*
                    THOMAS M. ZALESKI
                    Assistant United States Attorney

Date: September 14, 2011

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Government's Omnibus Response and Memorandum of Law in Opposition to Defendants' Motions to Suppress Physical Evidence was served by electronic filing to the following counsel:

Thomas A. Dreyer, Esquire
6 Dickinson Drive
Bldg. 100, Suite 106
Chadds Ford, PA 19317
Email: tdreyer610@aol.com

William DeStefano, Esquire
Buchanan, Ingersoll, Rooney, P.C.
50 S. 16th St., Suite 3200
Philadelphia, PA 19103
Email: william.destefano@bipc.com

Rocco C. Cipparone, Jr., Esquire
203-205 Black Horse Pike
Haddon Heights, NJ 08035
Email: courtnotices@cipparonelaw.com

_Thomas M. Zaleski_
THOMAS M. ZALESKI
Assistant United States Attorney

Dated: September 14, 2011

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

    V.                                :      CRIMINAL NO. 11-226-01-03

HARRY KATZIN                      :
MICHAEL KATZIN
MARK KATZIN                       :


O R D E R

    AND NOW, this          day of September, 2011, upon
consideration of the defendants' motions and memorandums of law
in support of his motions to suppress physical evidence, and the
government's response thereto, it is hereby ORDERED that the
defendants' motions are DENIED.



                                         BY THE COURT:



                                         _____
                                         GENE E.K. PRATTER, JUDGE
                                         UNITED STATES DISTRICT COURT