IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA          :

    V.                            :          CRIMINAL NO. 11-226-01-03

HARRY KATZIN                      :
MICHAEL KATZIN
MARK KATZIN                       :


GOVERNMENT'S SUPPLEMENTAL OMNIBUS RESPONSE AND MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS TO SUPPRESS
PHYSICAL EVIDENCE


        The United States of America, by and through United
States Attorney Zane David Memeger, and its undersigned
attorneys, hereby files this supplemental memorandum in support
of its earlier response in opposition to the defendants' motions
to suppress physical evidence.


I.    INTRODUCTION

        Earlier in this case, the defendants filed motions to
suppress the evidence of the Hamburg Rite Aid burglary that had
been obtained during a search of defendant Harry Katzin's van
pursuant to a search warrant, after the van had been seized by
the Pennsylvania State Police (PSP).  The defendants had
collectively rested their arguments on three grounds.  The
defendants argued for suppression of evidence on grounds that the
evidence was obtained because the FBI applied a GPS tracking

- 1 -

device on Harry Katzin's vehicle without first obtaining a search warrant, in violation of the defendants' Fourth Amendment rights to be free from unreasonable searches and seizures. The defendants also argued that the evidence obtained from a search of their van should be suppressed on grounds that it was stopped without reasonable suspicion, and searched without probable cause.

The government filed its initial omnibus response to the defendant's motions and this Court held a hearing on the motions on September 15, 2011. While the motions were pending, the issue of whether the attachment of a Global Positioning-System (GPS) tracking device to an individual's vehicle, and subsequent use of that device to monitor the vehicle's movements on public streets, constituted a search or seizure within the meaning of the Fourth Amendment was pending before the U.S. Supreme Court on a government appeal of the D.C. Circuit Court of Appeals decision in United States v. Maynard, 615 F.3d 544 (D.C. Cir. 2010), a case relied upon by the defendants in support of their motions to suppress. On January 23, 2012, the Supreme Court issued its decision on the appeal. United States v. Jones, 132 S. Ct. 945 (2012).

The government now submits this supplemental response in opposition to the defendant's motion to suppress evidence obtained from the application of a GPS device to defendant Harry

Katzin's vehicle in light of the U.S. Supreme Court decision in
Jones, where the Court affirmed the suppression of location data
generated by a GPS tracking device surreptitiously affixed to a
car without court authorization and monitored continuously over a
28-day period. In Jones, the Supreme Court held "that the
Government's installation of a GPS device on a target's vehicle,
and its use of that device to monitor the vehicle's movements,
constitutes a 'search'" within the meaning of the Fourth
Amendment. Id. at 949 (footnote omitted). Because the
government had installed a GPS tracking device on the
undercarriage of Jones's vehicle without a valid warrant and had
then monitored the vehicle's location by means of satellite
signals over the course of 28 days, the Court affirmed the
suppression of the GPS-derived locational data.

The Supreme Court held that the government's
installation of a GPS device on a vehicle, and its use of that
device to monitor the vehicle's movements, constitutes a
"search." It left open, however, whether the search requires a
warrant, probable cause, or something less. See Jones, 132 S.
Ct. at 954; but see id. at 964 (Alito, J., concurring) ("where
uncertainty exists with respect to whether a certain period of
GPS surveillance is long enough to constitute a Fourth Amendment
search, the police may always seek a warrant"). The Court did
not consider whether reasonable suspicion could have supported

the search, because the government had not raised that argument in the court of appeals. Id. at 954.

This Court has granted the government's request to supplement its earlier filing in opposition to the defendants' motions to suppress the evidence derived from the application of the GPS device to defendant Harry Katzin's motor vehicle. The defendants have not filed any supplemental memoranda thus far in support of their original motions.

In this supplemental response, the government will address the Jones holding, and its impact on the GPS issue previously raised by the defendants relying on the case of United States v. Maynard, 615 F.3d 544 (D.C. Cir. 2010). The government maintains that the fruits of the application of a GPS device on defendant Harry Katzin's motor vehicle and subsequent monitoring remain admissible on multiple grounds: 1) defendant Harry Katzin's codefendants Mark and Michael Katzin lack standing to contest this issue, and thus the GPS-derived evidence remains admissible against them; 2) there was reasonable suspicion to support the use of the GPS device, and it was unnecessary for the government to obtain a warrant before applying the device; 3) there was probable cause to support the application of the device, and the government was not required to obtain a warrant under the automobile exception to the Fourth Amendment; and 4) the government agents acted in good faith reliance on the

existing case law when they applied the GPS device to Harry
Katzin's vehicle without first obtaining a warrant, and
subsequently monitored Katzin's vehicle for less than three days.

II.  FACTUAL BACKGROUND

     A.    The FBI investigation of pharmacy burglaries

          For approximately 18 months preceding the arrest of the
Katzin defendants on December 16, 2010, the Philadelphia FBI and
local law enforcement were investigating a string of late-night
pharmacy burglaries in the tri-state Philadelphia area.  Over 100
pharmacies located in several jurisdictions including the
Philadelphia region, Delaware, Maryland, and New Jersey had been
burglarized.  Many of these pharmacies were Rite Aid drugstores
that carried large amounts of Schedule II controlled substances
in the form of prescription medications for customers.  In
addition to the Rite Aid burglaries, there also had been
burglaries at other pharmacies such as Walgreens drugstores, and
other smaller independently owned pharmacies.

          In the majority of the burglaries, large quantities of
narcotics were stolen, including Percocet, Oxycodone,
Hydrocodone, Morphine, Alprazolam, and Methadone.  These
burglaries were committed usually in the late evening to early
morning hours.  The burglars entered by several methods including
drilling out the door lock and disabling the alarm and

surveillance equipment, prying entry way doors, and cutting holes through business roofs or through adjacent buildings.  In multiple cases, the surveillance equipment had also been stolen or disabled during the burglaries.

In May 2010, FBI Special Agent Steven McQueen learned from various sources that defendant Harry Katzin, 28, was a suspect in the pharmacy burglaries.  N.T. 9-15-11, p. 8.  McQueen also learned Katzin was an electrician by trade, who lived in the Kensington section of Philadelphia.  N.T. 9-15-11, pp. 18-20.  Harry Katzin had a criminal record in Pennsylvania, and had been previously arrested on July 8, 2004, in Bucks County, for criminal attempt, possession of an instrument of a crime, false identification to law enforcement, and violation of a prohibition of junk storage; and, on August 19, 2006, in Philadelphia for burglary, theft by unlawful taking, and receiving stolen property.  Harry Katzin had not been convicted of these charges, but FBI SA Steven McQueen was aware of the following additional incidents involving Katzin that had occurred in 2010 and had been documented by local police in several townships:

1) <u>Egg Harbor Twp. Rite Aid attempted burglary</u> - On April 4, 2010, at 3:00 a.m., Egg Harbor City Police arrested Harry Katzin and another man in an attempted pharmacy burglary at a Rite Aid pharmacy in Egg Harbor City, Atlantic County, New Jersey.  On the date of the arrest, Katzin and the other male

were apprehended after their burglary was interrupted by the police.  Harry Katzin was operating a rented Dodge Ram with Pennsylvania registration.  Police found two pry bars, black ski masks, gloves, and small magnets inside the Ram.  Police checked the Rite Aid and found that the rear door had been pried open and the phone lines had been cut.  Police also found magnets on top of the door frame to connect the door alarm switch.  Police charged Harry Katzin with attempted burglary, and Katzin was able to post bail after his arrest.  The charges in this case were pending and Harry Katzin remained on bail in connection with them when PSP Troopers arrested Katzin on December 16, 2010.

2) <u>Lansdowne Rite Aid attempt</u> - On October 23, 2010, a Lansdowne, Delaware County police officer stopped Harry Katzin between 1:00 a.m. and 3:00 a.m. after a neighbor who lived near a Rite Aid pharmacy called police and reported seeing a suspicious male crouching behind some bushes.  N.T. 9-15-11, p. 17-18.  The police arrived and located Harry Katzin.  <u>Id</u>.  After Katzin identified himself, the police asked him why he was there so early in the morning.  <u>Id</u>.  Katzin gave no reason for being there, and changed his story several times.  <u>Id</u>.  First he said he was looking for bars, then he said he was looking for a friend's house.  Katzin had cuts on his hands and tools in a pickup truck.  <u>Id</u>.  Katzin was not arrested, but on the following day, police determined that the phone lines had been cut in the

back of the Rite Aid where Harry Katzin had been stopped earlier that morning.  N.T. 9-15-11, p. 18.

       3) <u>Feasterville Rite Aid Attempt</u> - On November 18, 2010, at approximately 1:44 a.m., a Lower Southampton Township Police Department officer stopped defendant Harry Katzin for suspicious activity in Feasterville, Pennsylvania.  Before the stop, the police officer observed a steel blue 2001 Dodge Caravan, bearing PA tag number HRD2148 (registered to Harry Katzin), parked behind the shopping center located at the 1800 block of Brownsville Road, Feasterville-Trevose.  The vehicle was registered to Harry Katzin at 1922 East Firth Street, in the Kensington section of Philadelphia, Pennsylvania.  The Caravan was occupied by three men, whom the police identified as Harry Katzin, his brother Michael Katzin, and another male.[1]  A Rite Aid pharmacy was located in the corner of the shopping plaza.

       Harry Katzin consented to the search of his vehicle. The police officer found numerous burglary tools, a miner's head lamp, several pairs of work gloves, and dark colored caps.  When the officer asked Harry Katzin about these items, Katzin replied

---

[1] At the time, defendant Michael Katzin, the defendant Harry Katzin's twin, had been arrested on at least five occasions and had been convicted of forgery and attempted theft by deception on January 31, 2008; of drug possession on May 29, 2008; and of false identification to a law enforcement officer on April 14, 2010.  Michael Katzin had also been arrested for burglary on September 22, 2007.  The other man also had been arrested on multiple occasions, and had been previously convicted of burglary and criminal trespass.

that he was an "electrician." The officer checked his computer to find if there were any outstanding warrants for the men, and there were none. The officer then released them without charges. Although the Rite Aid had not been burglarized that night, police learned later that day that the telephone lines in the rear of the Rite Aid had been cut.[2]

4) <u>Gibbstown, New Jersey Rite Aid burglary</u> - Over one week later, on November 26, 2010, at approximately 7:00 a.m., employees at a Rite Aid pharmacy located at 380 Harmony Road, Gibbstown, New Jersey, found that the store had been burglarized. The electrical power lines to the shopping center had been cut, as were the phone lines for the Rite Aid pharmacy. The actors entered the pharmacy through its rear door after prying it away from its threshold. The pharmacy's Schedule II drugs were stolen, and the surveillance DVR machine had been removed from the manager's office.

Police responded to the scene and retrieved surveillance video from a nearby video surveillance camera located at an adjacent Shop Rite supermarket. The videotape showed a steel blue minivan pulling into the parking lot across the street from the Rite Aid. This minivan appeared to be

---

[2] This Rite Aid had been previously burglarized approximately one year before this incident. On this occasion, the Rite Aid's telephone lines had not been affected, but when asked by the police, the manager speculated that the wires may have been cut the year before.

similar to Harry Katzin's 2001 Dodge Caravan in body shape and color. The videotape showed two men sitting in the van for over an hour facing the direction of the Rite Aid. The FBI believed that the men were waiting for any police response after cutting power to the store's alarm system.

B. Application of the GPS device to Harry Katzin's Dodge Caravan.

With knowledge of the above incidents and Harry Katzin's criminal history, and after consultation with the U.S. Attorney's Office, Special Agent McQueen (SA) made arrangements to apply a GPS tracking device on Harry Katzin's Dodge Caravan. SA McQueen notified the FBI's technical squad, who then devised a plan of operation to place the device on Harry Katzin's vehicle. Between 1:30 a.m. and 3:30 a.m. on December 13, 2010, FBI personnel applied the GPS device to the exterior undercarriage of the Dodge Caravan when it was parked on a public street in the lower Kensington section of Philadelphia, a typical inner city rowhouse neighborhood. N.T. 9-15-11, pp. 90-94. The device was battery operated, and was not hard-wired into the vehicle, and thus was not powered by the vehicle. N.T. 9-15-11, pp. 24-26. After FBI personnel applied the device to Katzin's vehicle, they quickly exited the area.

C. December 15 and 16, 2010.

During the late evening hours of Wednesday, December 15, 2010, FBI Special Agent (SA) Stephen McQueen was

conducting electronic GPS surveillance on Harry Katzin's steel
blue 2001 Dodge Caravan, bearing PA tag number HRD2148
(hereinafter referred to as the "Dodge Caravan") through the use
of the previously described "slap-on" GPS device.   McQueen
observed on his computer that Harry Katzin's Dodge Caravan left
the Kensington section of Philadelphia at approximately 10:45
p.m.  The Dodge Caravan traveled north on Interstate 476 north of
the Interstate 76 interchange, and continued to travel north on
Interstate 476 to Interstate 78.  The Dodge Caravan turned onto
westbound Interstate 78 at approximately 11:24 p.m. and continued
west on Interstate 78 to the town of Hamburg, Pennsylvania in
Berks County.  Upon reaching Hamburg, a distance of approximately
80 miles from Kensington, the Dodge Caravan traveled south on 4th
Street to the area of Hawk Ridge Drive.  The Dodge Caravan then
stopped in that area at approximately 11:49 p.m.  A Rite Aid
Pharmacy was located at 807 South 4th Street in Hamburg,
Pennsylvania.  The Dodge Caravan became stationery at 11:49 p.m.,
in the immediate vicinity of the Rite Aid pharmacy.

        During his monitoring of the Dodge Caravan, SA Steven
McQueen alerted Pennsylvania State Police (PSP) at the Hamburg
Barracks and advised them of the Dodge Caravan's whereabouts and
that the registered owner of the Dodge Caravan, Harry Katzin, was
a suspected burglar in numerous pharmacy burglaries.  SA McQueen
advised the PSP that Harry Katzin and others may be committing a

burglary at the Rite Aid Pharmacy located at 807 South 4th Street in Hamburg.  Troopers maintained a presence in the vicinity of the Rite Aid, but they avoided direct surveillance of the Dodge Caravan to avoid detection by the vehicle's occupants.  Special Agent McQueen maintained frequent telephone contact with the PSP while he monitored the Dodge Caravan, which remained stationary by the Rite Aid for almost three hours.  When the Dodge Caravan left the vicinity of the Rite Aid at approximately 2:40 a.m. on December 16, 2010, Special Agent McQueen alerted the PSP.

Within moments, PSP troopers Miller and Schuetrumpf observed the Dodge Caravan, traveling north on 4th Street in the Hamburg Borough near the on-ramp to Interstate 78 eastbound.  PSP troopers followed the Dodge Caravan onto I-78 eastbound (towards Philadelphia) while Hamburg Police Department officers went to the Rite Aid at 807 South 4th Street, in Hamburg, and confirmed by looking through the drive through window of the store that it had been burglarized.  Hamburg police officer Mengel relayed this information to the PSP, whose troopers who were following the Dodge Caravan.[3]

---

[3] When officers later entered the Rite Aid store, and inspected the store's interior, the officers found that most of the pharmacy's Schedule II drugs were stolen along with other products including items such as Gillette "Fusion" razor blades, ink cartridges, perfume, electronic items such as computer thumb drives, and electric tooth brushes.

PSP troopers Schuetrumpf and Miller then executed a traffic stop of the Dodge Caravan on eastbound I-78 at milepost 46.7, Weisenberg Township, Lehigh County, Pennsylvania.  Upon stopping the Dodge Caravan, Troopers identified its occupants as defendants Harry Katzin, his twin brother, Michael Katzin, and their older brother, Mark Lewis Katzin Jr.  All three males advised the PSP that they resided at 1922 East Firth Street, Philadelphia, Pennsylvania.

While outside of the van, a PSP trooper looked inside the Dodge Caravan and observed in plain view items which appeared to be from the Rite Aid that had just been confirmed by the Hamburg Police Department as having been burglarized, including boxes of "Fusion" razor blades, contraceptive aids, a Wii Sports pack, computer thumb drives, pill bottles, and Rite Aid plastic storage bins.  Also in plain view within the Caravan were tools, a duffel bag, and a surveillance system recordable hard drive unit which had its wires cut from the rear.  The Caravan was seized as evidence pending a search and seizure warrant and the three Katzin brothers were placed in custody and transported to the PSP barracks for investigation.  The PSP later executed a locally obtained search warrant on the Caravan and recovered numerous items that had been taken from the Hamburg Rite Aid (described earlier in the government's initial response).

III.  LEGAL ARGUMENT

   A.   Only defendant Harry Katzin has standing to contest the
        installation of the GPS device.

        The threshold issue in this case concerns the issue of

standing, and which of the three defendants has standing to

challenge the installation of a GPS device on the vehicle at

issue in this case.  The government does not dispute that the

owner and operator of the Dodge Caravan, defendant Harry Katzin,

has standing to make such a challenge.  However, Harry Katzin's

codefendants, his brothers Michael and Mark, who were mere

passengers when the vehicle was stopped on I-78 on December 16,

2010, clearly do not have standing to make the same challenge.[4]

        To seek suppression of evidence based on a Fourth

Amendment violation, a defendant must show that his own Fourth

Amendment rights were violated.  Minnesota v. Carter, 525 U.S.

83, 88 (1998); see United States v. Payner, 447 U.S. 727, 731

(1980) ("the defendant's Fourth Amendment rights are violated

only when the challenged conduct invaded *his* legitimate

_____

     [4]  "Standing" is used here as shorthand for an individual's
authority to seek suppression based either on a trespass or an
infringement of a reasonable expectation of privacy.  The Supreme
Court made clear in Rakas v. Illinois that questions concerning
an individual's ability to claim Fourth Amendment protections are
"more properly placed within the purview of substantive Fourth
Amendment law than within that of standing," 439 U.S. 128, 140
(1978), but the Court still occasionally uses the term "standing"
when addressing whether an individual can assert a Fourth
Amendment claim.  See, e.g., Kentucky v. King, 131 S. Ct. 1849,
1854 n.1 (2011).

expectation of privacy rather than that of a third party")
(emphasis in original).

It is well established that passengers lack sufficient
control over a vehicle to be treated as having a possessory
interest and therefore cannot raise a trespass challenge to the
installation of a GPS device on the vehicle. *See* Harper & James,
§ 2.1, at 96 ("[o]ne may use a chattel without possessing it, as
where a guest rides at the invitation of another"); United States
v. Marquez, 605 F.3d 604, 609 (8th Cir. 2010) ("Acosta neither
owned nor drove the Ford and was only an occasional passenger
therein. He therefore lacked standing to contest the
installation and use of the GPS device."). There is no evidence
in the record that either Michael or Mark Katzin had a possessory
interest in the vehicle. The evidence shows that they were
simply passengers in the vehicle when Pennsylvania State Troopers
stopped it. The theory of the majority opinion in Jones is that
installation of a GPS device constitutes a "search" because it
represents a trespass on property rights. The only individual
with any property right in the vehicle was Harry Katzin.

As passengers, defendants Michael and Mark Katzin also
lack a reasonable expectation of privacy in the vehicle, and thus
lack standing even pursuant to Justice Alito's concurring opinion
in Jones, which assessed the GPS issue in these terms. See Rakas
v. Illinois, 439 U.S. 128, 140-149 (1978) (passengers in car

which they neither owned nor leased lacked a reasonable

expectation of privacy in the glove compartment and area under

the seat); United States v. Pulliam, 405 F.3d 782, 786 (9th Cir.

2005) (passenger "with no possessory interest in the car" "has no

reasonable expectation of privacy . . . that would permit [his]

Fourth Amendment challenge to a search of the car") (internal

quotation marks omitted); United States v. Cooper, 133 F.3d 1394,

1398 (11th Cir. 1998) ("A passenger usually lacks a privacy

interest in a vehicle that the passenger neither owns nor rents,

regardless of whether the driver owns or rents it.") (dictum).

When FBI agents applied the GPS device to Harry

Katzin's Caravan, the agents did not have any knowledge as to who

would be Harry Katzin's future passengers.  Accordingly, when the

FBI began to track Harry Katzin's vehicle, on December 15, 2010,

it was only in a position to conclude that it was likely that

Harry Katzin was operating the vehicle.  The FBI thus would not

have been in a position to track the movements of specific

passengers when the FBI did not even know their names, or whether

there were any passengers in the vehicle simply by looking at the

results of the GPS tracking device.  For all of these reasons,

defendants Michael and Mark Katzin thus have no standing to

challenge the government's search of Harry Katzin's vehicle by

means of electronic GPS surveillance.   The motions of Michael

and Mark to suppress the fruits of the GPS tracking must be denied.

> B. The application of the GPS device on Harry Katzin's vehicle was supported by reasonable suspicion.

Turning to Harry Katzin's claim, his motion to suppress should be denied as well, for several reasons.[5]  First, the motion is meritless because the FBI had sufficient reasonable suspicion to permit the installation and use of the GPS device.

The holding in <u>Jones</u> is limited.  There, the Court held only that installation and use of a GPS device on a vehicle is a "search" subject to Fourth Amendment standards.  The Court did not reach the question whether a warrant is required, and what degree of suspicion is necessary to permit the search.  In fact, the Court expressly declined to reach the government's argument that reasonable suspicion was sufficient, because the government failed to preserve it in that case.  <u>See</u> 132 S. Ct. at 954.  This case presents those issues.

Not every Fourth Amendment intrusion requires a warrant or probable cause; to the contrary, the general test is one of reasonableness.  The Supreme Court "examine[s] the totality of the circumstances" to determine whether a search or seizure is reasonable under the Fourth Amendment.  <u>Samson v. California</u>, 547

---

[5]  All of these reasons will also counsel rejection of the other defendants' motions, if the government's position regarding standing is not accepted.

U.S. 843, 848 (2006) (internal marks and citation omitted).

Under that analysis, the reasonableness of a search or seizure is

determined "by assessing, on the one hand, the degree to which it

intrudes upon an individual's privacy and, on the other, the

degree to which it is needed for the promotion of legitimate

governmental interests." Id. (internal quotation mark omitted);

see Wyoming v. Houghton, 526 U.S. 295, 300 (1999). Since Terry

v. Ohio, 392 U.S. 1 (1968), the Court has identified various law

enforcement actions that qualify as Fourth Amendment searches or

seizures, but that may nevertheless be conducted without a

warrant or probable cause. See, e.g., Samson, 547 U.S. at 847

(individualized suspicion not required for search of parolee's

home or person); United States v. Flores-Montano, 541 U.S. 149,

155 (2004) (no reasonable suspicion required to remove,

disassemble, and reassemble a vehicle's fuel tank during a border

search); United States v. Knights, 534 U.S. 112, 118-21 (2001)

(upholding search of probationer's home based on reasonable

suspicion); Vernonia School Dist. 47J v. Acton, 515 U.S. 646,

654-66 (1995) (random, suspicionless urinalysis drug testing of

student-athletes permissible); Maryland v. Buie, 494 U.S. 325,

334 (1990) (properly limited protective sweep in conjunction with

in-home arrest can be conducted when searching officer possesses

reasonable belief based on specific and articulable facts that

area to be swept harbors individual posing danger to those on

arrest scene); <u>New Jersey v. T.L.O.</u>, 469 U.S. 325, 341-42 (1985) (upholding search of public school student based on reasonable suspicion); <u>United States v. Place</u>, 462 U.S. 696, 706 (1983) (upholding seizure of traveler's luggage on reasonable suspicion that it contains narcotics); <u>United States v. Martinez-Fuerte</u>, 428 U.S. 543, 554-55 (1976) (upholding suspicionless vehicle stops at fixed border patrol checkpoints).  Although the contexts of these cases vary, the underlying principles strongly support an exception to the warrant and probable-cause requirements in the GPS situation.

        In applying the Supreme Court's balancing test to GPS tracking of vehicles on public roads, it is apparent that neither a warrant nor probable cause should be required.  <u>See</u> <u>United States v. Marquez</u>, 605 F.3d 604, 610 (8th Cir. 2010); <u>United States v. Michael</u>, 645 F.2d 252, 257-59 (5th Cir. 1981) (en banc).  The intrusion occasioned by installation of a tracking device on a vehicle is minimal.  Installation is much less intrusive than the typical stop and frisk of a person.  Nothing from the vehicle is removed, and usually no enclosed area is entered.  In this case, the FBI employed a "slap-on" device that was battery operated, and was not wired to, nor drew power from, the Dodge Caravan's engine.  N.T. 9-15-11, pp. 24-25.

        With respect to the monitoring, the privacy interest, at least when the monitoring is for a limited time, is minimal.

A GPS tracking device conducts neither a visual nor an aural search of the item to which it is attached.  Cf. Smith v. Maryland, 442 U.S. 735, 741-42 (1979) (noting that pen register records only the numbers dialed from a phone and not the contents of any conversation).  The device, by itself, does not reveal who is in the car as driver or passenger, what the occupants are doing, or what they do when they arrive at their destination.  Unless combined with other information, it provides information only about the vehicle's location.  And the information that the tracking device reveals about the vehicle's location could also be obtained (albeit less efficiently) by means of visual surveillance.  The Supreme Court "has recognized significant differences between motor vehicles and other property which permit warrantless searches of automobiles in circumstances in which warrantless searches would not be reasonable in other contexts."  United States v. Chadwick, 433 U.S. 1, 12 (1977); see also Cardwell v. Lewis, 417 U.S. 583, 590 (1974); South Dakota v. Opperman, 428 U.S. 364, 368 (1976).

On the other hand, the minimal protection of an individual's privacy from obtaining a warrant before installing a tracking device on a vehicle would come at great expense to law enforcement investigations.  Requiring a warrant and probable cause before officers may attach a GPS device to a vehicle would seriously impede the government's ability to investigate drug

trafficking, terrorism, and other crimes.  Law enforcement

officers could not use GPS devices to gather information to

establish probable cause, which is often the most productive use

of such devices.  Thus, the balancing of law enforcement

interests with the minimally intrusive nature of GPS installation

and monitoring makes clear that a showing of reasonable suspicion

suffices to permit use of a "slap-on" device.  Just as this

balancing allows a stop and frisk of a person in the <u>Terry</u>

context, to follow up on investigative leads and assure the

safety of officers, so too only reasonable suspicion is needed

for the minimally invasive act of following a vehicle through use

of a GPS device.

       In this case, the FBI had ample reasonable suspicion to

support the application of the GPS device to defendant Harry

Katzin's Dodge Caravan.  "Reasonable suspicion" is defined as "a

particularized and objective basis for suspecting that the

particular person" is involved in criminal activity, based upon

the totality of the circumstances.  <u>United States v. Nelson</u>, 284

F.3d 472, 478 (3d Cir. 2002), quoting <u>United States v. Cortez</u>,

449 U.S. 411, 417-18 (1981).  In formulating reasonable

suspicion, the officers' "experience and specialized training may

allow them to make inferences and deductions from information

that 'might well elude an untrained person.'" <u>United States v.

Arvizu</u>, 534 U.S. 266, 273 (2002).  The Supreme Court has held

that "reasonable suspicion" is a standard under which "the likelihood of criminal activity need not rise to the level required for probable cause," and is one which "falls considerably short of satisfying a preponderance of the evidence standard."  Id. at 273-74, quoting United States v. Sokolow, 490 U.S. 1, 7 (1989); see also United States v. Valentine, 232 F.3d 350, 353 (3d Cir. 2000).  Reasonable suspicion is a less demanding standard than probable cause in the sense that it can be established with information that is different in quantity or content than that required to establish probable cause, and that is less reliable than that required to show probable cause. Alabama v. White, 496 U.S. 325, 330 (1990).

The FBI possessed reasonable suspicion (indeed, as discussed later, probable cause) that Katzin was using the minivan to commit pharmacy burglaries.  The FBI was aware of at least four previous incidents where Harry Katzin was likely engaged in either burglarizing or attempting to burglarize a Rite Aid pharmacy in 2010.  In April 2010, local police in New Jersey arrested Katzin and another man after they were caught breaking into a Rite Aid pharmacy.  Katzin and the other male were found with burglary tools and magnets (for disabling alarm mechanisms) in their truck, and the rear door of the Rite Aid had been pried open.  At the time of this event, Harry Katzin had a criminal record in Pennsylvania that included an arrest for burglary.  In

addition, Katzin was a trained electrician.  Katzin had admitted
this to law enforcement and FBI SA Steven McQueen confirmed this
after determining before the GPS device was placed on Katzin's
vehicle that Katzin was employed with a local electrical
contractor.  N.T. 9-15-11, pp. 10, 18-20.  This was significant
as the burglars were gaining entry into the Rite Aid pharmacies
by regularly defeating their alarm systems.

The FBI was also aware of three other incidents nearer
in time to the actual placement of the GPS device on Harry
Katzin's vehicle, while Katzin was out on bail for his New Jersey
arrest.  On October 23, 2010, Lansdowne Police caught Katzin
prowling behind the rear of a Rite Aid in Delaware County in the
early morning hours after receiving a call from a suspicious
neighbor.  When Katzin was stopped, he gave differing accounts
for his reason for being in the area, and he was found with
burglary tools.  He explained to police at the time that he was
an electrician.  Later that day, police discovered that telephone
lines in the rear of that Rite Aid had been cut.  Katzin had cuts
on his hands when police had confronted him earlier that day.

In November 2010, just several weeks before the
placement of the GPS, local police in Feasterville found Katzin
in a parking lot near a Rite Aid under suspicious circumstances
in the early morning hours.  In this case, Katzin was with his
brother and another man, both of whom had been previously

arrested on multiple occasions and convicted of burglary. They were found in the Dodge Caravan registered to Harry Katzin. The men were found with burglary tools, a miner's head lamp, and dark colored hats. Although the men were not arrested, the police later discovered that telephone wires near the Rite Aid had been cut.

Finally, on November 26, 2010, the FBI learned that the Gibbstown, New Jersey Rite Aid had been burglarized. When the videotapes from a nearby surveillance camera at the Shop Rite supermarket had been retrieved by police, a van remarkably similar in color and body size and shape to the Dodge Caravan owned by Harry Katzin was seen on the videotape parked in the Rite Aid parking lot during the early morning hours of the same day. The van was occupied by two men who were facing the Rite Aid.

Given this evidence, combined with the agent's experience in law enforcement and in investigating pharmacy burglaries, SA McQueen had at least "a particularized and objective basis for suspecting" that Harry Katzin was engaging in a pattern of "criminal activity" that involved the burglarizing of Rite Aid pharmacies. The evidence was so great at the time of the application of the GPS device to Harry Katzin's van that it not only justified reasonable suspicion that Katzin was burglarizing Rite Aid pharmacies, but it also supported a

probable cause finding that Katzin was burglarizing Rite Aid pharmacies on a frequent basis and using his Dodge Caravan to do so.  Therefore, his motion to suppress must be denied.

      C.    The application of the GPS device and subsequent monitoring was supported by probable cause and no <u>warrant was required under the automobile exception.</u>

      The warrantless GPS monitoring was also supported by probable cause for the same facts set forth above in support of reasonable suspicion.  Probable cause to conduct a search exists "when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" <u>United States v. Hodge</u>, 246 F.3d 301, 305 (3d Cir. 2001), citing <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).  At the time the FBI placed the GPS device on the defendant Harry's Katzin's vehicle, the FBI had substantial and fresh evidence at its disposal to indicate that defendant Harry Katzin was using his personal van to burglarize Rite Aid pharmacies in the Philadelphia area.  Given this probable cause, and the fact that the object of the search was a motor vehicle, the FBI was not obligated to obtain a warrant under the automobile exception to the warrant requirement.  <u>Cf.</u>  <u>New York v. Class</u>, 475 U.S. 106, 117-119 (1986) (officer's momentary reaching into the interior of a vehicle to expose the VIN was reasonable where officer had "some probable cause focusing suspicion on the individual affected by the search").

The automobile exception to the warrant requirement
permits law enforcement officers to stop and search an automobile
without a warrant if "probable cause exists to believe it
contains contraband."  Pennsylvania v. Labron, 518 U.S. 938, 940
(1996).  Under this exception, "where there [is] probable cause
to search a vehicle, a search is not unreasonable if based on
facts that would justify the issuance of a warrant, even though a
warrant has not been actually obtained."  Maryland v. Dyson, 527
U.S. 465, 467 (1999) (internal quotations and citation omitted).
The exception "allows warrantless searches of any part of a
vehicle that may conceal evidence . . . where there is probable
cause to believe that the vehicle contains evidence of a crime."
Karnes v. Skrutski, 62 F.3d 485, 498 (3d Cir. 1995), quoting
United States v. McGlory, 968 F.2d 309, 343 (3d Cir. 1992); see
also United States v. Salmon, 944 F.2d 1106, 1123 (3d Cir. 1991)
(noting the automobile exception permits warrantless searches of
any part of vehicle, including containers, if there is probable
cause to believe the vehicle contains contraband).

        The rationale of the automobile exception was stated by
the Supreme Court long ago:

        [T]he guaranty of freedom from unreasonable searches and
        seizures by the Fourth Amendment has been construed,
        practically since the beginning of the government, as
        recognizing a necessary difference between a search of a
        store, dwelling house, or other structure in respect of
        which a proper official warrant readily may be obtained and
        a search of a ship, motor boat, wagon, or automobile for
        contraband goods, where it is not practicable to secure a

> warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

Carroll v. United States, 267 U.S. 132, 153 (1925).  The exception allows a warrantless search even of a vehicle which has been stopped or seized by the police, and evidently cannot move until the search is completed.  See, e.g., United States v. Ross, 456 U.S. 798, 807 n.9 (1982) (summarizing cases).  The Court's decisions in this regard are "based on the practicalities of the situations presented and a realistic appraisal of the relatively minor protection that a contrary rule would provide for privacy interests."  Id.

Accordingly, the use of a GPS device, both to install the device at the opportune time and then track a moving vehicle, does not require a warrant.  At most, if the argument presented above concerning reasonable suspicion is inaccurate, it requires a showing of probable cause, which was abundantly present in this case.

    D.   The agents were operating under good faith when the applied the GPS device to the defendant's vehicle.

The motion to suppress should be denied for yet another alternative reason.  Even if the arguments presented above concerning reasonable suspicion, probable cause, and the absence of a warrant are all incorrect, the evidence obtained through the warrantless use of a GPS device cannot be suppressed because the

agents acted in objective good faith on the basis of existing law.

In a series of recent decisions, the Supreme Court has emphasized and reinforced the principle that "[t]he fact that a Fourth Amendment violation occurred - i.e., that a search or arrest was unreasonable - does not necessarily mean that the exclusionary rule applies.  Indeed, exclusion 'has always been our last resort, not our first impulse,' and our precedents establish important principles that constrain application of the exclusionary rule."  Herring v. United States, 555 U.S. 135, 140 (2009).  The Court continued:  "the exclusionary rule is not an individual right and applies only where it 'result[s] in appreciable deterrence.'  We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation.  Instead we have focused on the efficacy of the rule in deterring Fourth Amendment violations in the future."  Id. at 141 (citations omitted).

In part, the Supreme Court reaffirmed, "the benefits of deterrence must outweigh the costs.  'We have never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence.'  '[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs.'"  Id. (citations

omitted).  "The principal cost of applying the rule is, of
course, letting guilty and possibly dangerous defendants go free
. . . ."  Id.[6]

Thus, Herring concluded, "the exclusionary rule serves
to deter deliberate, reckless, or grossly negligent conduct, or
in some circumstances recurring or systemic negligence."  Id. at
144.  Otherwise, the cost of applying the exclusionary rule
considerably outweighs any deterrent effect to be had from
punishing merely negligent or entirely blameless conduct.

Notably, the Court has enforced these principles in
denying suppression where an officer relied in objective good
faith on statutory or case law which later changed.  In that
situation, the officer did not commit any error, let alone act in
a grossly negligent fashion.  The officer simply obeyed the then-
binding rule of the legislature or the courts, and any deterrent
purpose of sanctioning such conduct is completely absent.

Most recently, in Davis v. United States, 131 S. Ct.
2419 (2011), the Court held that "searches conducted in
objectively reasonable reliance on binding appellate precedent
are not subject to the exclusionary rule."  Id. at 2423-24.  In
Davis, the defendant presented a motion to suppress on the basis

---

[6]  The decision in Hudson v. Michigan, 547 U.S. 586 (2006),
made the same points, at considerable length.  There, the Supreme
Court concluded that the exclusionary rule never applies to a
violation of the knock-and-announce rule.

of <u>Arizona v. Gant</u>, 556 U.S. 332 (2009), which narrowed the circumstances in which police may search a vehicle incident to the arrest of its driver, and overruled the earlier, more permissive ruling in <u>New York v. Belton</u>, 453 U.S. 454 (1980). The <u>Davis</u> Court held that the exclusionary rule was inapplicable to the conduct of an officer who acted in good faith reliance on <u>Belton</u> before <u>Gant</u> was decided. The Court held that "suppression would do nothing to deter police misconduct in these circumstances," and unacceptably "would come at a high cost to both the truth and the public safety . . . ." <u>Davis</u>, 131 S. Ct. at 2423.

<u>Davis</u> is consistent with other Supreme Court rulings declining to apply the exclusionary rule where the mistakes at issue are those of legislators or judges, rather than the officers themselves. <u>See, e.g.</u>, <u>United States v. Leon</u>, 468 U.S. 897, 920-21 (1984) (exclusionary rule does not apply where an officer relies in good faith on the magistrate's assessment of probable cause in issuing a warrant; "Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations."); <u>Massachusetts v. Shepard</u>, 468 U.S. 981, 987-88 (1984) (same); <u>Illinois v. Krull</u>, 480 U.S. 340, 349-50 (1987) (applying the good-faith exception to searches conducted in reasonable reliance on subsequently invalidated statutes; "legislators, like judicial

officers, are not the focus of the rule"); <u>Arizona v. Evans</u>, 514

U.S. 1, 14 (1995) (good-faith reliance on erroneous information

concerning an arrest warrant in a database maintained by judicial

employees).[7]

In short, "when the police act with an objectively

reasonable good-faith belief that their conduct is lawful, or

when their conduct involves only simple, isolated negligence, the

deterrence rationale loses much of its force and exclusion cannot

pay its way."  <u>Davis</u>, 131 S. Ct. at 2427-28 (internal citations

and quotation marks omitted).  That is the situation here.[8]

Before <u>Jones</u>, every court of appeals to consider the

question -- with the exception of the D.C. Circuit's decision in

the case affirmed by the Supreme Court in <u>Jones</u> – had concluded

that, in light of the Supreme Court's decision in <u>Knotts</u>, police

did not need to obtain a warrant to install a GPS tracking device

on the exterior of a vehicle or to use that device to monitor the

vehicle's movements on public roads.  In <u>United States v. Knotts</u>,

460 U.S. 276 (1983), the Supreme Court held that the use of an

electronic beeper (which had been placed in a drum with the

_____

[7]  In <u>Herring</u>, the Court extended the exception to apply in
a case where the erroneous record-keeping was the product of
negligence of police employees.  The Court held that "isolated,"
"nonrecurring" police negligence is not sufficient to warrant the
harsh penalty sanction of exclusion.  <u>See</u> 555 U.S. at 137, 144.

[8]  The prevalent pre-<u>Jones</u> view of the federal courts was
also discussed at length in the government's prior memorandum in
this case opposing suppression.  Memo., pp. 17-18.

consent of its owner) to track a vehicle on public streets "was
neither a 'search' nor a 'seizure' within the contemplation of
the Fourth Amendment." Id. at 285.  A number of courts of
appeals understandably relied on Knotts to hold that the
installation and monitoring of a tracking device (including a
slap-on GPS device) on a vehicle is not a "search" or "seizure"
subject to the Fourth Amendment's warrant requirement.  See
United States v. Cuevas-Perez, 640 F.3d 272, 275-76 (7th Cir.
2011); United States v. Garcia, 474 F.3d 994, 996-98 (7th Cir.
2007); United States v. Pineda-Moreno, 591 F.3d 1212 (9th Cir.
2010); United States v. McIver, 186 F.3d 1119, 1127 (9th Cir.
1999).  Other courts of appeals held that the use of tracking
devices required reasonable suspicion but not a warrant based on
a judicial finding of probable cause, a threshold easily met in
this case.  See United States v. Marquez, 605 F.3d 604, 610 (8th
Cir. 2010); United States v. Michael, 645 F.2d 252, 257-59 (5th
Cir. 1981) (en banc).[9]

_____

    [9] Although not "binding precedent" under Davis, many
district courts had likewise approved warrantless GPS
surveillance prior to Jones.  See, e.g., United States v. Narrl,
789 F. Supp. 2d 645, 652 (D.S.C. 2011); United States v. Walker,
771 F. Supp. 2d 803, 808-13 (W.D. Mich. 2011); United States v.
Sparks, 750 F. Supp. 2d 384, 390-96 (D. Mass. 2010); United
States v. Jesus-Nunez, 2010 WL 2991229, at *4-*5 (M.D. Pa. 2010);
United States v. Burton, 698 F. Supp. 2d 1303, 1305-08 (N.D. Fla.
2010); United States v. Coombs, 2009 WL 3823730, at *4-*5 (D.
Ariz. 2009); United States v. Williams, 650 F. Supp. 2d 633, 668
(W.D. Ky. 2009); United States v. Moran, 349 F. Supp. 2d 425,
467-468 (N.D.N.Y. 2005).

In light of the consensus among these courts that a warrant was not required to conduct GPS surveillance, a reasonable police officer would believe that the Fourth Amendment's warrant requirement did not apply to such circumstances, and there would be no deterrent value in suppressing evidence obtained as a result. The sole exception of the D.C. Circuit's decision in <u>United States v. Maynard</u>, 615 F.3d 544, 555-66 (D.C. Cir. 2010), decided only four months before the actions at issue in this case, surely does not change this result. The fact that federal judges could not agree regarding the propriety of GPS vehicle monitoring only confirms that the agent's action was anything but the type of deliberate or grossly negligent misconduct to which the exclusionary rule exclusively applies.

In fact, the very rationale of the majority opinion in <u>Jones</u> -- that installation of a GPS device is a "search" because it constitutes a "trespass" -- marked a radical shift in Fourth Amendment jurisprudence which no reasonable officer could conceivably be charged with anticipating. As Justice Alito explained at length in his concurring opinion, <u>Jones</u>, 132 S. Ct. at 959-60, the majority revived a concept which had apparently been laid to rest in <u>Katz v. United States</u>, 389 U.S. 347 (1967). <u>Katz</u> had altered Fourth Amendment analysis to focus on reasonable expectation of privacy in determining whether an action

constituted a Fourth Amendment search, the same analysis which numerous courts then applied in finding that no warrant was required for use of a GPS device on a vehicle.  Even the D.C. Circuit decision in <u>Maynard</u> (which the Supreme Court affirmed in <u>Jones</u>) itself did not anticipate the <u>Jones</u> majority's trespass rationale, and analyzed the issue exclusively under the reasonable-expectation-of-privacy rubric.  The showing of good faith in the agent's actions in this case is therefore manifest.

      As a final note, the showing of good faith is even stronger in this case in that a reasonable officer could rely not only on judicial precedent, but the considered opinions of experienced government attorneys.  Recently, in <u>Messerschmidt v. Millender</u>, 2012 WL 555206 (U.S. Feb. 22, 2012), the Supreme Court held that a lower court erred in denying qualified immunity to officers who conducted a search which was purportedly based on deficient probable cause.  The Court noted that the standard for qualified immunity for an officer in a civil suit -- whether the officer's actions were objectively reasonable -- is the same test applied in criminal cases under the "good faith" rule of <u>Leon</u>. <u>Messerschmidt</u> particularly dealt with the principle that an officer who obtains a deficient search warrant may not be found to have acted in good faith where the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."

Messerschmidt makes clear that this conclusion should be quite rare, applying only to "plainly incompetent" conduct, and did not apply in this case. Significantly, in the course of its lengthy analysis of the underlying facts, the Court held that it is relevant in demonstrating good faith to show that the affiant obtained approval of the warrant application from a superior and a prosecutor before submitting it to a magistrate. Id. at *12.

In this case, the agent consulted with an Assistant United States Attorney, who also, relying on prevailing case law, deemed appropriate the warrantless installation and monitoring of a tracking device. For this additional reason, the agent plainly did not engage in the type of grossly negligent conduct to which the exclusionary rule exclusively applies, and suppression is not warranted.

III. CONCLUSION

   WHEREFORE, the defendants' motions to suppress physical evidence of the Rite Aid burglary recovered from Harry Katzin's vehicle should be denied.[10]

        Respectfully submitted,

        ZANE DAVID MEMEGER
        United States Attorney

        THOMAS PERRICONE
        Assistant United States Attorney
        Chief, Narcotics


        *s/ Thomas M. Zaleski*
        THOMAS M. ZALESKI
        Assistant United States Attorney

---

   [10] The government also moves this Court for the opportunity to open the record and schedule another evidentiary hearing in light of the Supreme Court's Jones decision, for the purpose of addressing the additional issues the Supreme Court raises in its opinion.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Government's Omnibus Response and Memorandum of Law in Opposition to Defendants' Motions to Suppress Physical Evidence was served by electronic filing to the following counsel:

Thomas A. Dreyer, Esquire
6 Dickinson Drive
Bldg. 100, Suite 106
Chadds Ford, PA 19317
Email: tdreyer610@aol.com

William DeStefano, Esquire
Stevens & Lee
1818 Market St., 29th Floor
Philadelphia, PA 19103
Email: wad@stevenslee.com

Rocco C. Cipparone, Jr., Esquire
203-205 Black Horse Pike
Haddon Heights, NJ 08035
Email: courtnotices@cipparonelaw.com


  s/ *Thomas M. Zaleski*
THOMAS M. ZALESKI
Assistant United States Attorney

Dated: March 7, 2012

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA        :

    V.                              :    CRIMINAL NO. 11-226-01-03

HARRY KATZIN                    :
MICHAEL KATZIN
MARK KATZIN                     :


O R D E R

    AND NOW, this _____ day of _____, 2012, upon
consideration of the defendants' motions and memoranda of law in
support of their motions to suppress physical evidence, and the
government's responses thereto, it is hereby ORDERED that the
defendants' motions are DENIED.

BY THE COURT:


_____
GENE E.K. PRATTER, JUDGE
UNITED STATES DISTRICT COURT