IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | HONORABLE GENE E.K. PRATTER |
| | : | |
| v. | : | CRIMINAL NO. 11-226-3 |
| | : | |
| | : | |
| MARK LEWIS KATZIN, JR. | : | |

**DEFENDANT MARK KATZIN'S SUPPLEMENTAL BRIEF IN
SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE**

On the brief:

Rocco C. Cipparone, Jr., Esquire
203-205 Black Horse Pike
Haddon Heights, NJ 08035
(856) 547-2100
www.CipparoneLaw.com

**Electronically Filed**

1

**FACTUAL BACKGROUND**

On December 13, 2010, Special Agent Steven McQueen coordinated with a Federal Bureau of Investigations ["FBI"] technical squad to devise a plan of operation to attach a GPS unit to a Dodge Caravan. Without applying for a warrant, agents planted the device on the underside of the Dodge vehicle, Pennsylvania Registration Number HRD2148, and proceeded to monitor the movements of the vehicle for several days.

At approximately 3:00 am on December 16, 2011, defendant Mark Katzin and his two brothers, co-defendants Harry Katzin and Michael Katzin, were stopped on the eastbound side of State Road 78 by Pennsylvania State Police Troopers (hereinafter "PSP troopers") while defendant Harry Katzin was driving the Dodge Caravan. **Exhibit A** (PSP Tpr. Matthew Brady's Report at 5 and Supplemental Reports attached thereto at 8-9). The only reason provided for the motor vehicle stop was that the Hamburg Borough Rite Aid allegedly was burglarized. **Exhibit A** (Tpr. Brady's Report at 5 and Supplemental Reports at 8-9).

Prior to the motor vehicle stop, FBI Agent Steven McQueen had contacted the Pennsylvania State Police ["PSP"] and requested that they aid in the FBI's investigation of Rite Aid burglaries. **Exhibit A** (Tpr. Brady's Report at 5). In particular, Agent McQueen requested that PSP troopers look out for a blue Dodge Caravan with Pennsylvania Registration Number HRD2148 because the FBI had it under GPS surveillance. **Exhibit A** (Tpr. Brady's Report at 5). The FBI specifically requested that the troopers not respond to the Rite Aid, and instead apprehend the van after it left the Rite Aid. **Exhibit A** (Tpr. Brady's Report at 8). PSP Tprs. Brian Miller and Kevin Schuetrumpf stationed themselves near a Rite Aid in Hamburg so that they could encounter the vehicle after it allegedly left a Rite Aid burglary in Hamburg Borough. The troopers were told to look for two or possibly three suspects in the blue Dodge Caravan.

**Exhibit A** (Tprs. Miller's and Schuetrumpf's Supplemental Reports Attached to Tpr. Brady's Report at 8-9).

Tprs. Miller and Schuetrumpf later observed the blue Dodge Caravan driving in their direction, and they followed the van for approximately eighteen minutes. **Exhibit A** (Supplemental Reports at 8-9). The blue Dodge Caravan did not violate any motor vehicle laws. **Exhibit B** (Pennsylvania Preliminary Hearing Testimony of Tpr. Schuetrumpf at 11). There is no indication in the reports that law enforcement visually observed the vehicle or its occupants at the Hamburg Borough Rite Aid during an alleged burglary. Only GPS data provided the location of the vehicle at that point in time. After the Troopers received verbal confirmation that the Hamburg Borough Rite Aid was burglarized, they instituted a motor vehicle stop of the Dodge Caravan. **Exhibit A** (Supplemental Reports at 8-9). The Troopers immediately placed defendant Mark Katzin and his two co-defendants under arrest, and seized various items from the van. **Exhibit A** (PSP Tpr. Brian Miller's and PSP Tpr. Kevin Schuetrumpf's Supplemental Reports, attached to Tpr. Brady's Report at 8-9).

## ARGUMENT

I. **MARK KATZIN HAS STANDING TO CHALLENGE THE SEARCH OF THE VAN**

    a. **Evidence Seized as a Result of the Motor Vehicle Stop Must Be Suppressed Because Mark Katzin had a Reasonable Expectation of Privacy in the Vehicle**

To have standing to challenge the search of a vehicle on Fourth Amendment grounds, a defendant must have a reasonable expectation of privacy in the vehicle. *United States v. Baker*, 221 F.3d 438, 442 (3d Cir. 2000). "Ownership is not necessary." *Baker*, 221 F.3d at 442. No single factor is invariably determinative. *Rakas v. Illinois*, 439 U.S. 128, 154 (1978). When a

3

passenger can show a property or possessory interest in a car, such passenger may establish a legitimate expectation of privacy for Fourth Amendment purposes. *See Rakas*, 439 U.S. at 148 (passenger's claim failed because he did not assert property or possessory interest).

Since the focus of the suppression motion has become more pinpointed to the GPS search issue and the issue of standing, the defense has inquired further about the nature of the use of the Dodge Caravan vehicle. Although not presently in the record, it is defense counsel's understanding that Dodge Caravan was purchased by the defendant Katzin brothers' mother, who was unable to drive, so that alternatively the three brothers could drive their mother back and forth to hospital and to doctor's visits during her last illness. All three of the brothers did so until the mother's death in February 2011. Thereafter, all three defendant Katzin brothers continued to live in the maternal house and frequently each defendant brother drove the van.[1] The van was initially titled in the name of Harry Hopkins, the defendants' mother's boyfriend, but then the title was transferred to defendant Harry subsequent to their mother's death.[2] Consequently, not just defendant Harry Katzin, but also defendants Mark and Michael Katzin, each had a possessory and equitable interest in the vehicle, and each used it, such that each defendant had a reasonable expectation of privacy regarding the vehicle. *United States v. Rose*, 731 F.2d 1337, 1343 (8th Cir. 1984) (holding that a defendant who permissively operated sibling's vehicle regularly had a reasonable expectation of privacy in the car, even though he was a passenger at the time that the vehicle was stopped).

---

[1] As acknowledged by the Government (Government Brief at 13), the Katzin brothers did advise the arresting troopers that they reside together. *See* also Indictment Designation Form, attached as **Exhibit D** (listing addresses of all three Katzin brothers as 1922 E. Firth Street, Philadelphia, PA).

[2] This information has been provided by Karen Katzin, the aunt of each of the defendant Katzin brothers. Ms. Katzin resided near the defendants and had personal observation and family knowledge of the information summarized above. The record (if the Court permits) can further be supplemented with the testimony of Ms. Katzin regarding those facts.

Furthermore, Pennsylvania law presupposes that family members who share a household also share use of the family vehicle. *See* Pa.C.S.A. § 1702 (2012). Pennsylvania's insurance law mandates that the definition of "insured" under an automobile insurance policy includes any relative living in the same household as the insured. Pa.C.S.A. § 1702. The Pennsylvania legislature has acknowledged the reasonable presumption that relatives who live in the same household also share an ownership or possessory interest in a vehicle registered to a cohabiting family member. The existence of such therefore also provided Mark (and Michael) Katzin a basis for their reasonable expectation of privacy regarding the Dodge Caravan vehicle.

### b. Mark Katzin has Standing to Seek Suppression of Evidence Seized as a Result of the Motor Vehicle Stop Because the Stop and Seizure Were Illegal

Mark Katzin had a reasonable expectation that that his passenger person would not be seized pursuant to a motor vehicle stop with tainted probable cause or tainted reasonable suspicion. That seizure was the result of an illegal motor vehicle stop of the Dodge van and all evidence seized from the vehicle was tainted by that illegal seizure. Therefore, all such evidence must be suppressed.

When a traffic stop itself is illegal, all occupants of the vehicle have standing to challenge the evidence on Fourth Amendment grounds. *United States v. Mosley*, 454 F.3d 249 (3d Cir. 2006). In *Mosley*, police illegally stopped a vehicle, found several guns, and charged the passenger with gun possession. *Mosley*, 454 F.3d at 251. The Third Circuit held that, despite not having a reasonable expectation of privacy in the vehicle, the stop itself violated the passenger's rights because it was an illegal seizure of his person: "Where the traffic stop itself is illegal, it is simply impossible for the police to obtain the challenged evidence without violating the passenger's Fourth Amendment rights." *Mosley*, 454 F.3d at 256. Indeed, the Third Circuit

in *Mosley* rejected the bifurcated analysis essentially urged here by the government, in favor of a unitary analysis:

> **Is an illegal traffic stop of a car occupied by a driver and a passenger a single constitutional violation**, with two victims, each of whom can seek to suppress all fruits of that violation? **Or is it analytically separable into two individual constitutional violations, each with one victim, each of whom may seek to suppress only the fruits of the violation of his individual right**? <u>**Today we endorse the former proposition**</u>, but as we acknowledge the logical appeal of the latter proposition, we will set out the best arguments in its favor, and then explain why we are rejecting them.

*Mosley*, 454 F.3d at 257-58 (bold and underline added). Put simply, "an illegal traffic stop entails a suppression remedy for all occupants of the car." *Mosley*, 454 F.3d at 266. Concerning the drive-passenger distinction which the government makes, the Third Circuit has rejected such in this context:

> We think the better view is that a traffic stop is a single act, which affects equally all occupants of a vehicle. To us, that description of traffic stops com-ports with the commonsense experience of everyone who has ever ridden in a car; we agree with the First Circuit that the distinction between passenger and driver 'is a distinction of no consequence in this context.' *Kimball*, 25 F.3d at 5.

*Mosley*, 454 F.3d at 267.

The United States Supreme Court, all nine Federal Courts of Appeals, and almost every state court to address the question agree that a passenger may challenge the legality of a traffic stop on Fourth Amendment grounds. *See Brendlin v. California*, 551 U.S. 249, 258-59 (2007) (summarizing cases). The Supreme Court, in *Brendlin*, confirmed that the proper remedy in such

6

a situation is to suppress any evidence found in the vehicle as the fruit of the poisonous tree. *Brendlin*, 551 U.S. at 259.

Mark Katzin clearly has standing to challenge the illegal seizure of his person under *Mosley* and *Brendlin*. As admitted by the arresting officers, the Katzin van violated no traffic laws. The stop of the van was materially justified based on an illegally planted GPS device. There was no visual observation of the van at the Hamburg Rite Aid which allegedly was burglarized. The only basis to know that the van was at the Rite Aid was the GPS data. There was no observation of any criminal activity by any of the van's occupants on the date at issue. There was no traffic infraction committed. Therefore, even assuming *arguendo* that Mark Katzin did not have a reasonable expectation of privacy in the Dodge Caravan, the subsequent use of the unconstitutionally planted device to justify a seizure of Mark Katzin's person clearly confers the requisite standing under the Fourth Amendment. There was no independent basis to suspect that Mark Katzin was engaged in any illegal activity. The police illegally seized Mark Katzin, and all evidence seized from the van is fruit of that illegal seizure. All passengers of the vehicle, including Mark Katzin, have standing to challenge the evidence as fruit of the illegal stop.

## II.   PROBABLE CAUSE IS REQUIRED TO JUSTIFY THE WARRANTLESS SEARCH OF A MOTOR VEHICLE

On January 23, 2012, the United State Supreme Court decided *United States v. Jones*, 132 S.Ct. 945, holding that a Fourth Amendment search occurs when the Government attaches a global positioning system ["GPS"] to a suspect's vehicle. In *Jones*, the police attached a GPS device to the defendant's vehicle after obtaining a warrant, but not until after the warrant had expired. *Jones*, 132 S.Ct. at 948. The Supreme Court affirmed the D.C. Circuit's holding that

attaching the GPS device without a warrant violated the Fourth Amendment. *Jones,* 132 S.Ct. at 949.

The Government here seeks to justify the warrantless search of the Katzin van. However "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347 (1967); *see also Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz*). Warrantless searches are only permitted when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985). *See also Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (quoting *T.L.O.*). "In cases where the securing of a warrant is reasonably practicable, it must be used." *Carroll v. United States*, 267 U.S. 132, 156 (1925).

Although under certain circumstances,[3] a warrant is not required to search an automobile, s*ee Pennsylvania v. Labron*, 518 U.S. 938 (1996), no such circumstances exist here. Even in such a circumstance, officers must have probable cause which would otherwise justify a search warrant. *Labron*, 518 U.S. at 940. Furthermore, although in other circumstances a limited search may be justified by reasonable suspicion, the legality of such searches are based on specialized or categorical circumstances which by their nature give the defendant a reduced expectation of privacy. *See, e.g. United States v. Knights*, 543 U.S. 112, 112-13 (2001) (holding that reasonable suspicion may justify search of probationer who agreed to submit to any search as condition of probation). The cases cited by the Government in its brief to support a warrantless search on less than probable cause (i.e. justified by the reasonable suspicion

---

[3] *See* Section III, *infra*, discussing inapplicability of exceptions to warrant requirement.

8

standard) involved circumstances in which, through <u>special status</u>, the defendant had a <u>reduced</u> expectation of privacy. *See* Government Brief at 17-18. The cases cited by the government involved:

- the search of a parolee (*Samson v. California,* 547 U.S. 843 (2006));

- a search at a fixed checkpoint on the U.S. border (*United States v. Flores-Montano,* 541 U.S. 149 (2004));

- the search of a probationer (*United States v. Knights*, 534 U.S. 112 (2001));

- the search of a student-athlete (*Veronia School Dist. 47J v. Acton*, 515 U.S. 646 (1995));

- a search incident to arrest (*Maryland v. Buie*, 494 U.S. 325 (1990));

- the search of a public school student (*New Jersey v. T.L.O.*, 469 U.S. 325 (1985)); and

- fixed border patrol checkpoints that did not require any individualized suspicion (*United States v. Martinez-Fuerte*, 428 U.S. 543 (1976)).

Other cases cited by the government in its brief fail to support the contention that the government may conduct a search of an automobile without a warrant, upon less than probable cause. *United States v. Place* concluded that, unlike attaching a GPA tracker to a vehicle, exposure of an airline traveler's luggage to a drug-sniffing dog was not a "search," under the Fourth Amendment. *Place*, 462 U.S. 696, 710 (1983). *Wyoming v. Houghton* required probable cause to justify the search of a car and its passengers. *Houghton,* 526 U.S. 295 (1999). *United States v. Marquez* and *United States v. Michael* both, in addition to being non-binding authority, involved the warrantless installation of a tracking device, and were decided before *Jones*. *Marquez,* 605 F.3d 604 (8th Cir. 2010); *Michael,* 645 F.2d 252 (1981).

The Government has alleged no facts which would give Mark Katzin or any other occupant of the van a reduced expectation of privacy in the Katzin van. The stop of the van and seizure of any of its occupants was not a routine search of a probationer or parolee. The van was

not attempting to cross a national border.  The stop was not at an even-handed checkpoint.  The Government has alleged no circumstance which has ever legally justified a search based on <u>reasonable suspicion</u> without probable cause.  The Government merely argues that law enforcement should be allowed to conduct a Fourth Amendment search, using a GPS tracker, of any vehicle, at any time, regardless of the possessor's reasonable expectation of privacy, based on mere reasonable suspicion.  As the caselaw demonstrates, and as more fully discussed in Section IV *infra*, the Fourth Amendment requires, at the very least, untainted probable cause that a motor vehicle contains contraband before searching the vehicle.

Furthermore, under the Government's urged balancing test, the privacy intrusion by a GPS tracker is substantial.  The Supreme Court has recognized that twenty-four hour surveillance without judicial supervision is constitutes "dragnet" type law enforcement.  *United States v. Knotts*, 460 U.S. 276, 283-84 (1983).  In *United States v. Maynard*, the D.C. Circuit explained the difference between prolonged GPS monitoring other other limited searches:

> First, unlike one's movements during a single journey, the whole of one's movements over the course of a [prolonged period] is not *actually* exposed to the public because the likelihood anyone will observe all those movements is effectively nil. Second, the whole of one's movements is not exposed *constructively* even though each individual movement is exposed, because that whole reveals more—sometimes a great deal more—than does the sum of its parts.

*Maynard*, 615 F.3d 544, 558 (D.C. Cir. 2010).  Thus, the intrusion by GPS monitoring is great.

Likewise, the Government's need for GPS surveillance without judicial oversight is small.  As discussed more fully *infra* at Section III, there was no legitimate reason why law enforcement could not have sought a warrant before attaching the GPS tracker and conducting surveillance on the Dodge Caravan.  There were no exigent circumstances.  As the government in its brief acknowledges, the agent in charge had time to speak with an attorney, to coordinate

with the FBI's technical squad to devise a "plan of operation," and to attach the device several weeks after the last robbery of which law enforcement had knowledge. *See* Government Brief at 10. Indeed, three days had elapsed from when the GPS device was placed on the van to the day it was tracked to Hamburg.

The Government's reliance on *Terry v. Ohio* (392 U.S. 1 (1968)) and its progeny is misplaced. *Terry* applies only to "on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." *Terry*, 392 U.S. 1 at 20. The Government alleges no such circumstances here. To the contrary, the Government describes a lengthy process of investigation, coordination, and planning, which render the practical considerations of *Terry* inapplicable.

Here the FBI suspect at least Harry Katzin of being involved in Rite-Aid burglaries well before the Hamburg, PA alleged robbery. Indeed, the GPS tracking device was installed on the Dodge Caravan at least three (3) days before the stop of the vehicle. Rather than engage in (although it would require more manpower) following the vehicle and making visual observations that potentially could have given rise to untainted probable cause, law enforcement here chose a more convenient – and for them unfortunately unconstitutional – tracking method. Law enforcement convenience cannot trump the need for – and here lack of – untainted probable cause and exceptional circumstances before a warrantless search can be justified.

### III. THE ATTACHMENT OF THE GPS DEVICE WAS UNCONSTITUTIONAL EVEN IF THE FBI HAD PROBABLE CAUSE THAT A CRIME WOULD BE COMMITTED IN THE FUTURE

A warrantless search of an automobile requires probable cause <u>that the vehicle contains contraband</u>. *United States v. Ross*, 456 U.S. 798, 807-08 (1982). Indeed, the Government in its brief acknowledges such by its quotation of the *Carrol* holding:

11

> [t]he guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile **for contraband goods**, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

Government Brief at 26-27 (quoting *Carrol*, 267 U.S. at 153) (emphasis added). *See also Ross*, 456 U.S. at 807-08 ("the Court in *Carroll* emphasized the importance of the requirement that officers have probable cause to believe that the vehicle contains contraband").

In the instant case, the Government had no reasonable suspicion, let alone probable cause, to believe that the Dodge Caravan contained contraband when agents attached the GPS device and tracked the vehicle. In fact, the Government argues only that "[t]he FBI possessed reasonable suspicion [and/or probable cause] that Katzin was using the minivan to commit pharmacy burglaries." Government Brief at 22. The only even arguably reasonable suspicion that the FBI had at the time of the GPS installation was a suspicion that the van would be used in *future* crimes, not that the van contained any contraband. That fact is even more evident from the conduct of the FBI. Rather than obtain a search warrant for the van (which it did not do because it did not have probable cause), the FBI attached a GPS tracker. Clearly, the FBI wanted to track the future movements of the vehicle, not to search it for contraband. The automobile exception to the warrant requirement has never been applied to such a situation, and the *Jones* holding mandates the opposite.

Furthermore, the Government gives no reason why obtaining a warrant would have been impractical before attaching the GPS device. Unlike the cases establishing the automobile exception, the Katzin vehicle was not being driven at the time of the GPS attachment. It was parked and unoccupied. There were no exigent circumstances. In fact, the agent in charge had

time to speak with an attorney, to coordinate with the FBI's technical squad to devise a "plan of operation," and to attach the device several weeks after the last robbery of which law enforcement had knowledge. *See* Government Brief at 10. There was no legitimate (exigent) reason based on time or mobility why the FBI could not have sought a warrant before attaching the GPS device. Indeed, three days had elapsed from when the GPS device was placed on the van to the day the Dodge was tracked to Hamburg. The Government acknowledges that GPS devices are often attached "to gather information to establish probable cause." Government Brief at 21. That is what happened here. Because the Government was required to obtain a warrant before attaching the GPS device, and there was no valid exception applicable, defendant Mark Katzin's motion to suppress should be granted.

## IV.   THE GOOD FAITH EXCEPTION DOES NOT APPLY WHEN LAW ENFORCEMENT REPRESENTATIVES INTERPRET LEGAL QUESTIONS RELYING ON NON-BINDING PRECEDENT

The good faith exception to the exclusionary rule operates to prevent exclusion of evidence obtained by law enforcement officers in good faith reliance on <u>binding</u>, clear legal authority. *See Davis v. United States*, 131 S.Ct. 2419 (2011). The exception has been held to apply when agents reasonably relied on a technically defective warrant, an applicable statute that was later overturned, or a <u>binding</u> appellate decision on point. *Davis*, 131 S.Ct. at 2429 (summarizing cases). To qualify for the good faith exception by relying on a judicial decision, law enforcement must rely on "binding precedent." *Davis*, 131 S.Ct. at 2429. In *Davis*, Alabama police officers relied on a then-binding Supreme Court decision, and several subsequent binding Eleventh Circuit decisions, which authorized the search of a vehicle incident to the arrest of one or more occupants. *Davis*, 131 S.Ct. at 2426. Two years after the search took place, the Supreme Court overturned the prior decision, and established more restrictive

rule with which the search did not comply. *Davis*, 131 S.Ct. at 2426. The Supreme Court declined to apply the exclusionary rule because the officer conducted the search "in reasonable reliance on **binding** judicial precedent." *Davis*, 131 S.Ct. at 2428 (bold added). As the Government's brief states, "*Davis* is consistent with other Supreme Court rulings declining to apply the exclusionary rule where the mistakes at issue are those of **legislators or judges**, rather than the officers themselves." Government brief at 30 (bold added).

The rationale behind the good faith exception is that the exclusionary rule functions to deter the police from violating constitutional rights, and the rule loses its deterrent effect when police rely in good faith on a binding legal decision, statute, or warrant. *See United States v. Leon*, 468 U.S. 897, 916-917. A magistrate cannot be deterred by the exclusionary rule because "magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions." *Leon*, 897 U.S. at 917.

Reliance on the advice of a prosecutor, however, is different, and is insufficient to preclude the operation of the exclusionary rule. In contrast to judges and magistrates, prosecutors are not neutral officers of the court. Prosecutors are "the chief law enforcement officer[s]" for the locality in which they serve. *Carter v. Philadelphia*, 181 F.3d 339 (3d Cir. 1999). Prosecutors, especially when they render opinions to or set policies for investigative agencies, are among the groups at which the exclusionary rule is aimed. *See Leon*, 897 U.S. at 918 ("[the exclusionary rule] must alter the behavior of individual law enforcement officers **or the policies of their departments**") (bold added).

When the GPS device was attached to the Katzin vehicle, there was no binding precedent in the Third Circuit holding that a warrant was <u>not</u> required to attach a GPS device to a suspect's vehicle. Indeed, at the time that the FBI agents attached the GPS device to the Katzin vehicle, at

14

least one federal court of appeals held that a warrant was required in such a situation.  *See United States v. Maynard*, 615 F.3d 544 (D.C. Cir 2010) (aff'd in *Jones*).  Although other federal courts of appeals held the opposite, none of those decisions were binding in the Third Circuit.  *See, e.g.*, *United States v. Cuevas-Perez*, 640 F.3d 272 (7th Cir. 2011); *United States v. Pineda-Moreno*, 591 F.3d 1212 (9th Cir. 2010).  The Government also cites *United States v. Knotts*, in which an electronic transmitter was placed inside a drum to assist law enforcement officers attempting to follow the truck, which only made a single trip, on which the drum was located.  *Knotts*, 460 U.S. 276, 282 (1983).  The *Knotts* Court explicitly cautioned that the *Knotts* analysis did not apply to "dragnet type  law enforcement practices" including "twenty four hour surveillance of [a] citizen… without judicial knowledge or supervision."  *Knotts*, 460 U.S. at 283-84.  Recognizing the obvious differences between twenty four hour GPS surveillance and the very limited surveillance in *Knotts*, the *Maynard* Court distinguished *Knotts* and held that GPS surveillance was a Fourth Amendment search.  *Maynard*, 615 F.3d at 556-58.

      The law enforcement agents who attached the GPS device to the Katzin vehicle were not acting in reliance on any <u>binding</u> authority opining that no search warrant was necessary to do so.  The agents, together with a prosecutor, instead used their own judgment to pick and choose between conflicting <u>non-binding</u> authority, to erroneously determine that a warrant was not required to attach a GPS tracking device to the Dodge Caravan.  Here, law enforcement made the erroneous (and at least at that time self-serving in terms of expedience) determination that a warrant was not required -- in the absence of binding legal authority to support that conclusion.  The good-faith exception does not apply to those circumstances.  As *Leon* makes clear, the policies of law enforcement are an explicit target of the exclusionary rule.  Because the good

faith exception to the exclusionary rule never was meant to apply to circumstances such as these, defendant Mark Katzin's motion to suppress should be granted.

        Respectfully submitted,

        *LAW OFFICES OF ROCCO C. CIPPARONE, JR.*

BY:    /s/ Rocco C. Cipparone, Jr.
        Rocco C. Cipparone, Jr., Esquire